**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**                    FOR PUBLICATION
--------------------------------------------------------X
In re:

BERNARD L. MADOFF INVESTMENT                    SIPA LIQUIDATION
SECURITIES LLC,                                                     No. 08-01789 (BRL)

                              Debtor.                                 (Substantively Consolidated)
--------------------------------------------------------X
IRVING H. PICARD, as Trustee for the
Liquidation of BERNARD L. MADOFF
INVESTMENT SECURITIES LLC,
                                                                            Adv. Pro. No. 09-1503 (BRL)

                              Plaintiff,

                    v.

PETER B. MADOFF, MARK D. MADOFF,
ANDREW H. MADOFF, and SHANA D.
MADOFF
                              Defendants.
--------------------------------------------------------X

APPEARANCES:

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone:    (212) 589-4200
Facsimile:     (212) 589-4201
By:    David J. Sheehan
         John Siegal
         Marc D. Powers

*Attorneys for Plaintiff Irving H. Picard, Trustee for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone:    (212) 373-3000
Facsimile:     (212) 757-3990
By:    Martin Flumenbaum
         Stephen J. Shimshak
         Andrew J. Ehrlich
         Hannah S. Sholl

*Attorneys for Defendant Andrew H Madoff, individually and as Executor of the Estate of Mark*
*D. Madoff*

LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
33rd Floor
New York, NY 10110
Telephone:    (212) 921-8399
Facsimile:    (212) 764-3701
By:    Charles T. Spada

*Attorney for Defendant Peter B. Madoff*

SMITH VALLIERE PLLC
75 Rockefeller Center
21st Floor
New York, NY 10019
Telephone:    (212) 755-5200
Facsimile:    (212) 755-5203
By:    Timothy A. Valliere

*Attorney for Defendant Shana D. Madoff*

Before: Hon. Burton R. Lifland
United States Bankruptcy Judge

## MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS TRUSTEE'S COMPLAINT

Before this Court are the motions (the "Motions to Dismiss") of Mark D. Madoff[1] and

Andrew H. Madoff, Peter M. Madoff, and Shana D. Madoff (the "Defendants") seeking to

dismiss the complaint (the "Complaint") filed in the above-captioned adversary proceeding by

---

[1] Mark D. Madoff passed away on December 11, 2010. The parties have stipulated that Mark D. Madoff in the above-captioned adversary proceeding is substituted by the Estate of Mark D. Madoff and Andrew H. Madoff, as Executor. *See* Stipulation and Order Substituting Party at p. 2 (dated Apr. 19, 2011) (Dkt. No. 47). For ease of reference, the Estate of Mark D. Madoff and Andrew H. Madoff, Executor, are referred to herein as Mark Madoff or Mark.

Irving H. Picard, Esq. (the "Trustee," or "Plaintiff"), trustee for the substantively consolidated

Securities Investor Protection Act ("SIPA")[2] liquidation ("SIPA Liquidation") of Bernard L.

Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), pursuant to

Federal Rule of Civil Procedure ("Rule") 12(b)(6), made applicable herein by Federal Rule of

Bankruptcy Procedure ("Bankruptcy Rule") 7012.[3]

The instant Complaint differs from all others connected to the Madoff Ponzi scheme in

one significant respect: its named Defendants are Madoff's brother, two sons, and niece. As set

forth in the Complaint, the Defendants held senior management positions at BLMIS, which, the

Trustee asserts, was "operated as if it was the family piggy bank," with the Defendants living in

multi-million dollar homes and relying on BLMIS funds to pay for vacations, travel, and other

personal expenses—all while failing to fulfill their responsibilities as high ranking employees of

the business. This failure was unsurprising given their close familial relationship with Madoff

and proximity to BLMIS, both of which undergird the claim at the heart of the Trustee's

Complaint: that if anyone was in a position to prevent Madoff's scheme, it was the Defendants,

who, instead, stood by profiting mightily while allowing it to persist. The Defendants

nevertheless steadfastly contend their involvement with BLMIS was entirely legitimate, and

---

[2] SIPA sections 78fff(b) and 78fff-2(c)(3) allow a SIPA Trustee to utilize the avoidance powers enjoyed by a bankruptcy trustee. *See In re Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 3568936, at *12 n. 10 (*In re BLMIS II*) (2d Cir. Aug. 16, 2011) ("A SIPA liquidation is a hybrid proceeding."). SIPA section 78fff(b) provides that "[t]o the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." 15 U.S.C. § 78fff(b). SIPA section 78fff-2(c)(3) states, in relevant part: "whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11." 15 U.S.C. § 78fff-2(c)(3).

[3] There is no paucity of decisional law regarding Bernard Madoff and the Trustee's restitutional litigation relating to this Ponzi saga. Instructive and pertinent to the factors to consider when parsing a Rule 12(b) motion to dismiss arising from the Madoff case is the recent decision of U.S. District Judge Kimba Wood (the "District Court") reviewing the Trustee's pleading sufficiency in another Madoff matter set at the same pleading stage as this one. *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 11 MC 0012, 2011 WL 3897970, at *13 (S.D.N.Y. Aug. 31, 2011) (*Merkin II*).

they, above all others, were betrayed by their family's patriarch. But even if they were victims of the cruelest betrayal, the Complaint alleges that the Defendants' failures to fulfill their responsibilities at BLMIS facilitated egregious harms.

The Trustee accordingly seeks to avoid and recover transfers made to the Defendants in the collective amount of over $198 million under various sections of the Bankruptcy Code (the "Code") and New York Debtor and Creditor Law[4] (the "NYDCL"); as well as to utilize sections of the Code to disallow and equitably subordinate those claims filed by the Defendants in the SIPA proceeding (collectively, the "Bankruptcy Claims").[5] In addition, the Trustee seeks tort damages for BLMIS by bringing claims under New York common law for breach of fiduciary duty, negligence, conversion, unjust enrichment, constructive trust, and accounting (the "Common Law Claims"). The Complaint, however, contains some correctable pleading deficiencies, and will need to be amended in part in order to stand as a matter of law.[6] Thus, as set forth below, the Defendants' Motions to Dismiss are DENIED in part and GRANTED in part.

## BACKGROUND

A comprehensive discussion of the facts underlying the SIPA Liquidation and Madoff's Ponzi scheme is set forth in this Court's prior decisions. *See In re Bernard L. Madoff Inv. Sec. LLC,* 424 B.R. 122, 125–32 (Bankr. S.D.N.Y. 2010) (*In re BLMIS I*), *aff'd*, Nos. 10-2378, *et al.*,

---

[4] N.Y. Debt. & Cred. Law § 270 *et seq.* (McKinney 2001).

[5] In accordance with this Court's decision in *Picard v. Merkin* the Trustee withdrew the claim for immediate turnover of alleged customer property pursuant to section 542 of the Code. 440 B.R. 243, 249–51 (Bankr. S.D.N.Y. 2010) (*Merkin I*) (dismissing the Trustee's turnover claim); *see also* Letter to Judge Burton R. Lifland in response to the Court's August 4, 2011 request for a supplemental brief addressing the decision in *Picard v. HSBC Bank PLC*, No. 11-CV-0763, *et al.* (S.D.N.Y. July 28, 2011) at p. 2, n.1 (No. 09-01503) (dated Aug. 12, 2011) (Dkt. No. 50) [Hereinafter "Trustee's Supplemental Letter"].

[6] The Complaint, like in a game of horseshoes, is a leaner rather than a ringer in that it misses the target, but comes close enough to score. For further discussion on leaners and ringers, see http://www.horseshoepitching.com/rules/Content.html (last visited on Sept. 21, 2011).

2011 WL 3568936 (2d Cir. Aug. 16, 2011) (*In re BLMIS II*); *see also Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),* 440 B.R. 243, 249–51 (Bankr. S.D.N.Y. 2010) (*Merkin I*), *leave to appeal denied,* 2011 WL 3897970, at *13 (S.D.N.Y. Aug. 31, 2011) (*Merkin II*).

## I.   THE DEFENDANTS

### A.   Peter B. Madoff

Peter B. Madoff ("Peter") is Madoff's brother and was BLMIS's Senior Managing Director and Chief Compliance Officer ("CCO").   He is a law school graduate and held a number of securities licenses with the Financial Industry Regulatory Authority ("FINRA"), including Series 1, 4, and 5.   Peter was the Director of the Securities Industry Financial Markets Associations ("SIFMA"), a member of the Board of Governors and the Executive Committee of the National Stock Exchange, the Vice Chairman of the FINRA Board of Governors, as well as a Director of the National Securities Clearing Corporation.   He also served on NASDAQ's Executive Committee Board of Governors.   Compl. ¶ 6.

As the CCO of BLMIS, Peter was allegedly responsible for adopting and administering compliance procedures to prevent and detect fraud and to identify and address significant compliance issues in accordance with SEC and FINRA regulations.   Compl. ¶¶ 28–36.   His duties included, *inter alia*, preparing the annual review of BLMIS's investment advisory business's ("IA Business") compliance program, performing qualitative tests of BLMIS's internal compliance procedures, and assessing whether such procedures were effectively implemented.   Compl. ¶¶ 28–36.

Peter is alleged to have received at least $60,631,292 from BLMIS, including, but not limited to, withdrawals of fictitious profits from investment advisory accounts at BLMIS ("IA Accounts"); salaries and bonuses from 2001 to 2008 in the total amount of $20,067,920; loans

totaling $13,244,649.30; and various other payments funding purchases of real estate, business investments, a life insurance policy, personal credit card bills, and the purchase and restoration of an Aston Martin automobile.[7]  Compl. ¶¶ 65–73.

### B.    Mark D. Madoff and Andrew H. Madoff

Mark D. Madoff ("Mark") and Andrew H. Madoff ("Andrew"), Madoff's sons, were Co-Directors of Trading at BLMIS and served as Controllers and Directors of Madoff Securities International Ltd. ("MSIL"), a U.K. affiliate of BLMIS.[8]  Both held securities licenses with FINRA, including Series 4, 7, 24, and 55, and were members of various securities organizations. Mark was Chairman of the FINRA Inter-Market Committee, Governor of the Securities Traders Association ("STA"), Co-Chair of the STA Trading Committee, a member of the FINRA Membership Committee and Mutual Fund Task Force, President of the Securities Trader Association of New York ("STANY"), Chairman of the FINRA Regulation District Ten Business Conduct Committee, and Chairman of the Securities Industry and Financial Markets Association ("SIFMA") NASDAQ committee.  Similarly, Andrew was Chairman of the Trading, Trading Issues and Technology, and Decimalization and Market Data Committees and Subcommittees at SIFMA.  He was also a member of the FINRA District Ten and NASDAQ Technology Advisory Committees.  Compl. ¶¶ 7, 8.

Andrew and Mark were purportedly responsible for ensuring compliance with BLMIS's

---

[7] Peter transferred his ownership interest in the Aston Martin to the Trustee on May 4, 2011.  Shortly thereafter, the Trustee won approval from this Court to retain an auctioneer to transport, store, repair and sell the Aston Martin at auction.  *See* Order Authorizing the Sale of the Property of the Estate at p. 2 (No. 08-01789) (dated June 15, 2011) (Dkt. No. 4165).  In August 2011, the Aston Martin was sold at auction for $225,000. *See* Notice of Sale of Aston Martin (No. 08-01789)(date Sept. 21, 2011)(Dkt. 4377).

[8] MSIL was placed into liquidation in the U.K. shortly after the commencement of this SIPA liquidation.  On April 14, 2009, the joint provisional liquidators for MSIL filed a chapter 15 petition in the United States Bankruptcy Court for the Southern District of Florida seeking recognition of the U.K. liquidation.  Following a transfer of that case to the Southern District of New York, this Court granted recognition of the U.K. liquidation as a foreign main proceeding.  *See* Order Recognizing Foreign Proceeding at p. 2 (No. 09-12998) (dated June 6, 2009) (Dkt. No. 25).

policies and procedures, as well as applicable securities laws.  Compl. ¶¶ 28–36, 47–49.

Mark allegedly received at least $66,859,311 from BLMIS, including, but not limited to, withdrawals of fictitious profits from IA Accounts; salaries and bonuses from 2001 to 2008 in the total amount of $29,320,830;  real estate loans in the amount of $15,126,589; and payments funding real estate purchases, business investments, and personal credit card bills.  Compl. ¶¶ 74–84.  Likewise, Andrew allegedly received at least $60,644,821 from BLMIS, including, but not limited to, withdrawals of fictitious profits from IA Accounts; $31,105,505 in salary and bonuses between 2001 and 2008; loans totaling $11,285,000; and various other payments funding business investments, the purchase and maintenance of a boat, and personal credit card expenses.  Compl. ¶¶ 85–94.

### C.    Shana Madoff

Shana Madoff ("Shana"), Madoff's niece, served as the in-house Counsel and Compliance Director for BLMIS.  She is a law school graduate and a member of the FINRA Consultative Committee;  STANY;  NASD's Market Regulation Committee, the SIFMA Self-Regulatory and SRO Committee, and the SIFMA Continuing Education Committee.  Compl. ¶ 9.

Like Peter, Shana was purportedly responsible for monitoring BLMIS's operations and ensuring compliance with federal securities laws and regulations and corresponding FINRA rules and regulations.  Compl. ¶¶ 28–36, 43–46.

Shana allegedly received at least $10,607,876 from BLMIS, including, but not limited to, withdrawals of fictitious profits from IA Accounts; salaries from 2001 to 2008 in the amount of $3,832,878; as well as various payments funding the purchase of a home, business investments, interior decoration, rent, and personal credit card expenses.  Compl. ¶¶ 95–98.

## MOTION TO DISMISS UNDER RULE 12(b)(6) STANDARD OF REVIEW

Rule 12(b)(6) allows a party to move to dismiss a cause of action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6); FED. R. BANKR. P. 7012(b). When considering a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).

To survive a motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); FED. R. BANKR. P. 7008. A recitation of the elements of the cause of action supported by mere conclusory statements, however, is insufficient. *Iqbal*, 129 S. Ct. at 1949. Rather, a complaint must state "a plausible claim for relief," *id.* at 1950, which would be the case where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.* at 1949. Finally, in determining plausibility, this Court must "draw on its judicial experience and common sense," *id.* at 1950, to decide whether the factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### DISCUSSION

## I. THE BANKRUPTCY CLAIMS

In Counts Two through Ten of the Complaint, the Trustee seeks to avoid and recover payments totaling $198,743,299 made to or for the benefit of the Defendants pursuant to sections 544, 547, 548, 550, and 551 of the Code and various sections of the NYDCL. The Trustee alleges that more than 383 transfers totaling $141,034,907 to or for the benefit of the Defendants in the six year period (the "Six-Year Transfers") prior to December 11, 2008 (the "Filing

Date"),[9] and are avoidable and recoverable under sections 544, 550(a), and 551 of the Code and sections 273 through 276 of the NYDCL. Compl. ¶106. Of the Six-Year Transfers, at least 129 totaling $58,666,811 were allegedly made within two years prior to the Filing Date (the "Two-Year Transfers") and are avoidable and recoverable under sections 548(a)(1), 550(a), and 551 of the Code. Compl. ¶ 107. Of the Two-Year Transfers, $7,364,048 was received by the Defendants within one year of the Filing Date (the "Preferences") and avoidable and recoverable under Code sections 547, 550(a), and 551. Compl. ¶ 108. Additionally, the Trustee alleges that BLMIS transferred a further $57,708,392 to the Defendants prior to six years before the Filing Date. Compl. ¶ 109. Finally, in Counts Eleven and Twelve of the Complaint, the Trustee requests that the proofs of claims filed by the Defendants in the SIPA Liquation should be disallowed and equitably subordinated pursuant to relevant sections of the Code.

### A.    Actual Fraud Under the Code and the NYDCL

In Counts Three and Five of the Complaint, the Trustee seeks to avoid and recover, under a theory of actual fraud, Two Year Transfers pursuant to section 548(a)(1)(A), and Six Year Transfers under section 544 of the Code and section 276 of the NYDCL (collectively, the "Actual Fraudulent Transfers"). With regard to the Trustee's Actual Fraudulent Transfers claims, although the Complaint adequately alleges the element of intent, it fails, in many instances, to state the factual circumstances constituting the fraud as required by Rule 9(b).

Pursuant to section 548(a)(1)(A) of the Code, a trustee must establish the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud." 11 U.S.C. § 548(a)(1)(A). Under section 276 of the NYDCL, a trustee similarly may avoid any "conveyance made . . . with

---

[9] On December 11, 2008, Bernard Madoff was arrested by federal agents for violation of criminal securities laws, including, *inter alia*, securities fraud investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities Exchange Commission filed a complaint in United States District Court for the Southern District of New York. Compl. ¶ 13; *see also In re BLMIS I*, 424 B.R. at 125–32.

actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." NYDCL § 276. A claim brought under either statute must be supported by enough factual allegations to satisfy the pleading requirements set forth under Rule 9(b). *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 106–07 (S.D.N.Y. 2004); *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007). Specifically, the "circumstances constituting fraud or mistake" must be pled with "particularity," but "[m]alice, intent, knowledge, and other conditions of a person's mind" may be pled generally. FED. R. CIV. P. 9(b); FED. R. BANKR. P. 7009.

### i. The Trustee Has Adequately Alleged the Element of Intent in His Actual Fraudulent Transfer Claims in Accordance with Rule 9(b)

As a matter of law, the "Ponzi scheme presumption" establishes the debtors' fraudulent intent as required under both the Code and the NYDCL. *Gowan v. The Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 428 (Bankr. S.D.N.Y. 2011). There is a presumption of actual intent to defraud because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Id*. at 423; *McHale v. Boulder Capital LLC (In re The 1031 Tax Group)*, 438 B.R. 47, 71 (Bankr. S.D.N.Y. 2010) ("If the Ponzi scheme presumption applies, actual intent for purposes of section 548(a)(1)(A) is established as a matter of law.") (internal quotations omitted). The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission. *See Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1305, 2011 WL 3274077, at *8 (Bankr. S.D.N.Y. Aug. 1, 2011); *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 221 (Bankr. S.D.N.Y. 2011); *see also Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv.*

*Fund Ltd.),* 397 B.R. 1, 12 (S.D.N.Y. 2007) (relying on transferor's criminal guilty plea to establish the existence of a Ponzi scheme). Moreover, while it is conceivable that "certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply," the Actual Fraudulent Transfers at issue here, including redemptions of fictitious profits and payments of salaries, "serve[d] to further [the] Ponzi scheme," and are therefore presumed fraudulent. *In re Manhattan Inv. Fund Ltd.,* 397 B.R. at 11.

The Ponzi scheme presumption applies only to the *transferor's* intent. *See Patriot,* 452 B.R. at 424. The Defendants, however, posit that the *transferee's* fraudulent intent must be established to state a claim under section 276 of the NYDCL. The District Court rejected this precise argument in *Merkin II,* explaining that "relevant cases, together with analysis of the statute, convince the Court that, to state a claim under Section 276, a plaintiff need allege fraudulent intent by only the transferor." 2011 WL 3897970, at *6 (citing *Patriot,* 452 B.R at 435) (emphasis added); *see also Cohmad,* 2011 WL 3274077, at *9 ("[I]t is the transferor's intent alone, and not the intent of the transferee, that is relevant under NYDCL § 276.") (quoting *Patriot,* 452 B.R. at 433); *Gowan v. Wachovia Bank, N.A.* (*In re Dreier LLP*), No. 10-5458, 2011 WL 3319711, at *8) (Bank. S.D.N.Y. Aug. 3, 2011) (holding that for the "reasons stated [in *Patriot*], the plaintiff is only required to plead the fraudulent intent of the transferor under DCL § 276"). The District Court reasoned that "transferee's intent . . . is material under the statute, but, because Section 278 is an affirmative defense, the transferee's intent should be considered on a full evidentiary record, either at the summary judgment phase or at trial." *Merkin II,* 2011 WL 3897970, at *6. Consequently, "[f]or the purposes of a motion to dismiss, the trustee need state with particularity only the circumstances constituting the fraud and allege the requisite actual intent by the *transferor* to hinder, delay, or defraud creditors." *Id.* (emphasis added). Thus,

irrespective of whether an actual fraudulent transfer claim is brought under the Code or the NYDCL, a transferee's good faith "need not be negated by the Trustee in the Complaint" as the Defendants contend. *Cohmad*, 2011 WL 3274077, at *9 (quoting *Sec. Prot. Inv. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 318 (Bankr. S.D.N.Y. 1999).[10] The element of intent for each of the Trustee's Actual Fraudulent Transfer claims is therefore established as a matter of law by virtue of the Ponzi scheme presumption.

### ii. The Trustee Has Not Identified All of the Actual Fraudulent Transfers with Particularity Under Rule 9(b)

The fraudulent intent of the debtor/transferor is one essential element of a *prima facie* claim brought under either section 548(a)(1)(A) of the Code or section 276 of the NYDCL. A second requirement is that the transfers sought to be avoided must be identified with particularity in accordance with Rule 9(b). FED. R. CIV. P. 9(b); FED. R. BANKR. P. 7009. Here, many of the Actual Fraudulent Transfers are not so identified.

To satisfy Rule 9(b)'s particularity requirement, a party must ordinarily allege: "(1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer and (3) the consideration paid with respect thereto." *Pereira v. Grecogas Ltd., (In re Saba Enters., Inc.)*, 421 B.R. 626, 640 (Bankr. S.D.N.Y. 2009); *see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002). Where the actual

---

[10] Accordingly, the Defendants' arguments that they "took for value" and "in good faith" are affirmative defenses under sections 548(c) of the Code and 278 of the NYDCL and thus "should be considered on a full evidentiary record, either at the summary judgment phase or at trial." *Merkin II*, 2011 WL 3897970, at *6 (citing *Patriot*, 452 B.R at 435); *see also Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 659 (Bankr. E.D.N.Y. 2008) ("An innocent purchaser must affirmatively show good faith in order to take advantage of [NYDCL] section 278(2)."); *Bayou Superfund LLC v. WAM Long/Short Fund II LP (In re Bayou Grp., LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith/value defense provided in Section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense."). If the affirmative defense "appears on the face of the complaint," however, an exception to this rule may apply. *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74-75 (2d Cir. 1998). This exception does not apply here. Indeed, the Trustee sufficiently alleges the Defendants had notice of fraud and were cognizant of the irregularities in their own IA Accounts. Accordingly, the Defendants' affirmative defense of good faith is not a viable ground for dismissal under Rule 12(b)(6).

fraudulent transfer claim is asserted by a bankruptcy trustee, however, courts in this district take "a more liberal view. . . since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (quoting *Picard v. Taylor (In re Park South Sec., LLC)*, 326 B.R. 505, 517, 516, 518 (Bankr. S.D.N.Y. 2005)) (internal quotations omitted). As the Second Circuit recently noted, "[f]raud is endlessly resourceful and the unraveling of weaved-up sins may sometimes require the grant of a measure of latitude to a SIPA trustee." *In re BLMIS*, 2011 WL 3568936, at *8, n.7 (granting SIPA trustees discretion to determine the method to calculate net equity).

Of course, "relaxing the particularity requirement" of Rule 9(b) does not "eliminate" it. *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987). Pleadings still must be particular enough to fulfill Rule 9(b)'s purpose: "to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Tronox Inc. v. Anadarko Petroleum Corp.. (In re Tronox Inc.)*, 429 B.R. 73, 92 (Bankr. S.D.N.Y. 2010) (citing *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 581 (Bankr. S.D.N.Y. 1999)); *see also Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("[S]ince Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit . . . the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations."). Such is not the case here where opacity, rather than particularity, best describes the allegations underlying the Trustee's Actual Fraudulent Transfer claims in Counts Three and Five of the Complaint.

To begin with, the Trustee fails to specify which Count he seeks to employ to avoid each Actual Fraudulent Transfer. For example, under Count Three, the Complaint fails to identify which of the Two Year Transfers are additionally Preferences.[11] Similarly, with respect Count Five, the Complaint states $57,708,392 was transferred at some time earlier than six years prior to the Filing Date without specifying how many individual Actual Fraudulent Transfers comprise this sum. The Trustee does not provide how he arrives at: (1) the total sum he seeks to avoid under Counts Three or Five, (2) the total number of discrete Actual Fraudulent Transfers included in each sum, and (3) which statutory look back period he intends to apply to each of these Transfers, and no inference to ameliorate these deficiencies can be drawn on the basis of the allegations contained in the Complaint.

Second, piecing together the facts contained in the Complaint reveals that the majority of the Actual Fraudulent Transfers are not identified completely. Peter's 1954 Aston Martin provides an illustrative example: allegedly there were four payments totaling approximately $274,562 for its purchase and restoration, but it is not clear how, to whom, or when those payments were made. Compl. ¶ 73; *see Official Comm. of Unsecured Creditors of M. Fabrikant & Sons Inc. v. JPMorgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 734 (Bankr. S.D.N.Y. 2008) (emphasizing "the Amended Complaint does not identify any specific transfer, transferor, transferee, or date of transfer"); *see also Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 646 (E.D.N.Y. 2003) (dismissing intentional fraudulent transfer claim that failed to identify the assets transferred and identified the date of transfer as "on or about 2001"). Similarly opaque are the allegations that between 2002 and 2008 the

---

[11]Pursuant to section 547(b)(4)(B) of the Code, the one year statutory look back period applies because the Complaint sufficiently alleges that the Defendants are "insiders" of BLMIS under section 101(31) of the Code, which defines an "insider" of a debtor corporation as an individual who was, among other things, a director, officer, or person in control of the debtor, or a relative of a director, officer, or person in control of the debtor. 11 U.S.C. §§ 101(31)(B), 547(b)(4)(B). .

Defendants used BLMIS funds to pay company credit card bills that included personal charges. Compl. ¶¶ 73, 84, 94, 98;  *see Fed. Nat'l. Mortgage Ass'n v. Olympia Mortgage. Corp.*, No. 04-CV-4971, 2006 WL 2802092, at *2, *9 (E.D.N.Y. Sept. 28, 2006) ("[T]he Amended Complaint . . . aggregates the transfers into lump sums over three to five year time periods [and] does not, with respect to each transaction, specify the mechanism of transfer or even the type of property transferred.").

Rectifying the majority of these pleading deficiencies upon amendment should not prove to be a Herculean task.  For example, more detailed information appears to be readily accessible to the Trustee given that the Complaint already includes information related to the credit cards used by the Defendants as well as examples of personal charges paid by BLMIS.  Compl. ¶¶ 73, 84, 94, 98.  Similarly, since the Trustee has indicated that *four* payments were made for the purchase and restoration of the Aston Martin, he likely can specify the method, amount, and date of each of those payments without much difficulty.  Compl. ¶ 73.  The Complaint as it currently stands, however, has too many porous and disparate factual allegations to provide a legal basis to sustain many of the Trustee's Actual Fraudulent Transfer claims.[12]  *See Fed. Nat'l. Mortgage Ass'n,* 2006 WL 2802092, at *9 (finding allegations insufficient for the heightened Rule 9(b) pleading standard where the Amended Complaint did "not identify how many transfers plaintiff is challenging or the specific dates and amounts of those transfers");  *Fabrikant*, 394 B.R. at 733 (noting that "[a]llegations that a debtor made an aggregate amount or series of cash or other transfers over a period of time" failed to meet the particularity standard set forth under Rule 9(b)).

---

[12] It bears noting that of the complaints filed by the Trustee in connection with Madoff Ponzi scheme, those that withstood Rule 9(b) scrutiny included multiple exhibits detailing the payments that the Trustee sought to avoid as actual fraudulent transfers. *See, e.g., Cohmad*, 2011 WL 3274077, at *7;  *Chais*, 445 B.R. at 220*;  Merkin I*, 440 B.R. at 258*.  No such exhibits were attached to the Complaint.

Notwithstanding these pleading deficiencies, the Complaint nevertheless identifies a few Actual Fraudulent Transfers with Rule 9(b) particularity (the "Particularly Pled Actual Fraudulent Transfers"). *See Fed. Nat'l. Mortgage Ass'n.*, 2006 WL 2802092, at *18 (dismissing the Complaint as to all but one actual fraudulent transfer, which was pled with sufficient particularity). For each of these Particularly Pled Actual Fraudulent Transfers, the Complaint alleges the transferee, transferor, and specific dates and amounts: Peter received a $9 million loan from the operating account for BLMIS's IA Business at JP Morgan Chase Bank (the "703 Account") on December 12, 2007, Comp ¶ 73; Mark redeemed $1,956,205 from his IA Account, numbered 1M0142, on or about July 24, 1998, $5,331,853 from his IA Account on or about April 3, 2002, and $1,956,205 from his children's IA Account, numbered 1M0143, on or about July 24, 1998, Compl. ¶¶ 78, 79, 82; and Andrew redeemed $1,956,205 from his IA Account, numbered 1M0140, on or about July 24, 1998, $5,331,853 from his IA Account, numbered 1M0140, on or about April 3, 2002, and $1,956,305 from his children's IA Account, numbered 1M0141, on or about July 24, 1998, Compl. ¶¶ 88, 89, 92. Another two Particularly Pled Actual Fraudulent Transfers[13] were made on October 31, 2000 to satisfy capital calls: one from BLMIS's operating account in the amount of $1,223,237.19 satisfied a capital call due to Madoff Technologies LLC by Shana, Compl. ¶ 98, and the second, in the amount of $54,915.25, satisfied a capital call due to Madoff Technologies LLC by Peter Madoff and came from one of BLMIS's operating accounts, Compl. ¶, 73; *see Fed. Nat'l.. Mortgage Ass'n*, 2006 WL 2802092, at *2 (upholding claim against Samuel Pinter to avoid and recover a transfer of

---

[13] The Court assumes that the Trustee seeks to recover these two transfers under a benefit theory pursuant to section 550(a)(1) of the Code. Compl. ¶ 73 ("[T]he Trustee has identified the following transfers to Peter or *on his behalf* for which BLMIS received no corresponding benefit or value.") (emphasis added); *see also Stratton Oakmont, Inc.*, 234 B.R. at 317–18 ("At this juncture, all the Trustee needs to demonstrate is a possible legal theory such that he is allowed to go forward and put on evidence. Although this benefit theory is not explicitly stated in the Complaint, recovery under § 550(a) is not subject to a particularized pleading standard and I am allowed to consider theories that are not articulated, so long as there are facts alleged to support them.").

$300,000 that was made from Olympia to Midwood in October 2002 to satisfy a loan taken by Samuel Pinter).  Therefore, this is not the death knell of the Complaint.

Accordingly, except with regard to Particularly Pled Actual Fraudulent Transfers, Counts Three and Five[14] of the Complaint are dismissed, with leave to amend the Complaint within forty five days.

**B.    The Trustee Has Sufficiently Pled the Application of the Discovery Rule to Avoid the Particularly Pled Actual Fraudulent Transfers Occurring Prior to Six Years Before the Filing Date**

All but one of the Particularly Pled Actual Fraudulent Transfers occurred more than six years prior to the Filing Date.  Consequently, these Transfers can be avoided only by invoking New York's "discovery rule," which permits a plaintiff to commence a cause of action predicated on actual fraud within two years of the date the fraud was or should have been discovered with reasonable diligence.  NYCPLR §§ 213(8), 203(g);  *see Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 67 (Bankr. E.D.N.Y. 2011) ("New York state law fixes the limitations period for claims under the DCL.  A claim based on actual fraud under DCL Section 276 must be brought within the later of six years from the date of the fraud or conveyance, or two years from the date that the fraud should have been discovered.").  For reasons stated below, Trustee has standing under section 544(b) to invoke the discovery rule for the Particularly Pled Actual Fraudulent Transfers that occurred more than six years before the Filing Date.

Pursuant to well-established case law, so long as a bankruptcy trustee provides sufficient

---

[14] Count Five's request for attorneys' fees under section 276-a of the NYDCL is not ripe for determination at this early stage.  *See Patriot,* 452 B.R. at 435 (finding that "attorneys' fees will only be recoverable if the Trustee establishes at trial actual fraudulent intent by Defendants"); *see also Cohmad*, 2011 WL 3274077, at *10 n.10 ("While the transferee's intent is an element of a claim under section 276–a, unlike under section 276, attorneys' fees will be recoverable provided that the Trustee establishes fraudulent intent on the part of the defendants at trial.").

notice to the defendants of at least one category of creditors that have standing to avoid an actual fraudulent transfer under non-bankruptcy law, the trustee has standing to assert that actual fraudulent transfer claim under section 544(b) of the Code. *Global Crossing Estate Rep. v. Winnick*, No. 04-CIV-2558, 2006 WL 2212776, at *11 (S.D.N.Y. Aug. 3, 2006) ("[T]o identify the category of creditors with potentially viable claims . . . is unquestionably enough to put defendants on notice of the creditors who supply the basis for the right to sue, and will permit them to answer, seek relevant discovery, and defend against these claims."); *see also Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 780 (Bankr. S.D.N.Y. 2008) (failing "to locate a case in this district supporting the proposition that the plaintiff must name the qualifying creditor in the complaint, or suffer dismissal"). Indeed, "there is no authority for the proposition that [a bankruptcy trustee] must be more specific than to identify the category of creditors with potentially viable claims" in order to state a claim under section 544 of the Code. *Winnick*, 2006 WL 2212776, at *11; *see In re RCM Global Long Term Cap. Appreciation. Fund, Ltd.*, 200 B.R. 514, 523–24 (Bankr. S.D.N.Y. 1996) (holding that pleading the existence of an unsecured creditor with an allowable claim is sufficient); *see also In re Musicland*, 398 B.R. at 780 ("Thus, *RCM* supports the proposition that the plaintiff may plead the existence of the qualifying creditor generally, and prove the existence of an actual, qualifying creditor at trial.").

The Complaint provides sufficient notice to the Defendants of at least one category of creditors on whose claims the Trustee bases his standing to avoid transfers under New York's discovery rule: defrauded BLMIS customers. Specifically, it states that "[a]t all times relevant to transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS," Compl. ¶ 161, and that "[a]t all times relevant to the

18

transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable . . . ." Compl. ¶ 162. These allegations, when viewed in conjunction with the aforementioned case law, compel this Court to conclude the Trustee has standing under section 544(b) of the Code to avoid and recover the Particularly Pled Actual Fraudulent Transfers made more than six years before the Filing Date.

### C.    Constructive Fraud Under the Code and the NYDCL

In Counts Four, Six, Seven, and Eight of the Complaint, the Trustee seeks to avoid and recover, under a theory of constructive fraud, Two Year Transfers pursuant to section 548(a)(1)(B) of the Code, and Six Year Transfers under section 544 of the Code and sections 273–275 of the NYDCL (collectively the "Constructive Fraudulent Transfers"). This Court finds most, but not all, of the allegations corresponding to the Constructive Fraudulent Transfers provide sufficient information to sustain the Trustee's avoidance claims under the liberal pleading standards of Rule 8(a), as set forth below.

Section 548(a)(1)(B) of the Code requires the Trustee to show, *inter alia*, BLMIS did not receive "reasonably equivalent value" for any of the transfers alleged to be fraudulent. 11 U.S.C. § 548(a)(1)(B). Similarly, under sections 273 through 275 of NYDCL, the Trustee must demonstrate BLMIS did not receive "fair consideration" for the same. NYDCL §§ 273–275. It has been found, "'reasonably equivalent value' in Section 548(a)(1)(b), [and] 'fair consideration' in the [NYDCL] . . . have the same fundamental meaning." *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.)*, 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000) (*Churchill I*), *aff'd*, *Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001) (*Churchill II*). Fair consideration can be established by showing either a lack of "fair equivalent" property or a lack of good faith on the part of the transferee. NYDCL § 272 (defining "fair consideration");

*see Patriot*, 2011 WL 2412581, at *39 ("To defeat a motion to dismiss, the Trustee need only allege a lack of 'fair consideration' by pleading a lack of 'fair equivalent' value *or* a lack of good faith on the part of the transferee.");   *Silverman* v. *Sound Around, Inc. (In re Allou Distribs., Inc.)*, 404 B.R. 710, 716 (Bankr. E.D.N.Y. 2009) ("[F]air consideration has two components— the exchange of fair value and good faith—and both are required.") (internal quotations omitted).[15]

Under both the Code and the NYDCL, courts consistently hold that "claims of constructive fraud do not need to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)." *Bank of Commc'ns v. Ocean Dev. Am., Inc.*, No. 07-CIV-4628, 2010 WL 768881, at *6 (S.D.N.Y. Mar. 8, 2010).   Rather, the Trustee need only satisfy Rule 8(a) by providing a "short and plain statement of the claim showing that [he] is entitled to relief."  FED. R. CIV. P. 8(a)(2); *see also Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*, No. 03–93172, 2006 WL 2400369, at *5 (Bankr. S.D.N.Y. May 11, 2006) ("The Court does not see any reason to break with its precedent in applying Rule 8(a) in evaluating the pleadings in a constructive fraudulent conveyance matter herein.");   *Stratton Oakmont, Inc.*, 234 B.R. at 319 ("The pleading of constructive fraud [under the NYDCL], as opposed to actual fraud, must only comply with F.R.C.P. 8(a) . . . .").   The purpose of this pleading requirement is to ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests."  *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 612 (Bankr. N.D.N.Y. 2010) (quoting *Twombly*,

---

[15] Contrary to the Defendants' position, BLMIS was insolvent at the time of the Constructive Fraudulent Transfers given that Ponzi schemes are, by definition, at all times insolvent.  *See Armstrong v. Collins*, Nos. 01 Civ. 2437, *et. al.*, 2010 WL 1141158, at *20 (S.D.N.Y. Mar. 24, 2010);  *Daley v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 486 n. 17 (D. Conn. 2002) ("[A] number of courts have held that an enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses.");  *see also Cunningham v. Brown*, 265 U.S. 1, 8 (1924) (noting Charles Ponzi, the namesake of the Ponzi scheme, "was always insolvent, and became daily more so, the more his business succeeded.  He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.").

550 U.S. at 545) (internal quotations omitted).    Indeed, "the sole consideration should be whether, consistent with the requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an answer, frame discovery, and defend against the charges." *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 429 (Bankr. S.D.N.Y. 1998) (internal citations omitted).

The Defendants concede that Rule 9(b) is typically not applicable because the conduct of the transferee is normally irrelevant to constructive fraud, which merely looks at the value given and the solvency of the transferor.    They contend nevertheless that Rule 9(b) does apply in the instant proceeding because the underlying allegations sound in fraud.    But not every allegation of wrongful conduct sounds in fraud for purposes of Rule 9(b);    the Trustee has not alleged, and need not allege for purposes of constructive fraud, that the Defendants were involved in the kind of misrepresentation or deceit that would require a heightened pleading standard.    Instead, the only relevant allegation to this Constructive Fraudulent Transfer claim is that the Defendants breached fiduciary duties by failing to perform compliance responsibilities and therefore did not provide value for their wages.    Such a breach of a fiduciary duty does not implicate Rule 9(b). *See Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Secs. Corp.*, No. 00 Civ. 8688, 2002 WL 362794, at *8 (S.D.N.Y. Mar. 6, 2002) (holding breaches of fiduciary duties "by conduct not amounting to fraud, *such as by breaching its duties of care, disclosure and loyalty*" do not require the heightened standards of Rule 9(b)) (emphasis added).    Furthermore, the Second Circuit has indicated that Rule 8(a) applies to constructive fraud claims even in cases where the courts consider the transferee's knowledge of the fraud and underlying conduct.    *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53–54 (2d Cir. 2005) (discussing constructive fraud and raising Rule 9(b) only in subsequent discussions of

actual fraud);  *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.*),  337 B.R. 791,

801 (Bankr. S.D.N.Y. 2005) ("[I]n [*Sharp*], the Second Circuit considered a motion to dismiss a

complaint that asserted claims of constructive and intentional fraudulent conveyance under New

York State law.  It held that the intentional fraud claims had to be pleaded in compliance with

Rule 9(b) but did not imply that the constructive fraud claims had to meet any such

requirement.").

> ### i.    The Trustee Has Sufficiently Pled that BLMIS Did Not Receive Value
> ### for Purposes of Constructive Fraud Under the Code and the NYDCL

The  Constructive  Fraudulent  Transfers  that  the  Trustee  seeks  to  avoid  include

Defendants' withdrawals of fictitious profits and receipt of salaries, bonuses, gifts, and loans

from BLMIS.  The Trustee has adequately alleged all of the Constructive Fraudulent Transfers

were made for less than "reasonably equivalent" or "fair equivalent" value.

With respect to the Defendants' withdrawals of profits from their BLMIS IA Accounts,

courts have consistently held that fictitious profits from a Ponzi scheme are deemed to have been

received for less than reasonably equivalent value and can be avoided.  *See Sender v. Buchanan*

*(In re Hedged-Inv. Assoc., Inc.)*, 84 F.3d 1286, 1290 (10th Cir. 1996) (holding payments in

excess of original investment do not provide any value);  *Scholes v. Lehmann*, 56 F.3d 750, 757

(7th Cir. 1995) ("The paying out of profits to [the defendant] not offset by further investments by

him conferred no benefit on the corporations . . . .");  *In re Bayou Grp., LLC*, 439 B.R. 284, 338

(S.D.N.Y. 2010) ("Because Appellants provided no value in exchange for the fictitious profits

they received, that portion of their redemption payments is voidable as a constructive fraudulent

conveyance.");  *Patriot*, 452 at 440 n.44 ("The Court's conclusion that the Defendants did not

provide reasonably equivalent value for the payments in excess of principal is consistent with

those courts that have held that investors in a Ponzi scheme are not entitled to retain the fictitious

profits they received.").   In addition, the Trustee's allegations, if proven, show that BLMIS received nothing in return for the gifts and loans the Defendants received.   Although promissory notes were exchanged for some of these Constructive Fraudulent Transfers, the Trustee has sufficiently alleged such notes were executed *pro forma* without intent to repay.   In particular, the Trustee could not find any payment of principal, interest, or otherwise that was given in exchange for the loans since the time they were made, which in some instances dates back to 2003.

The Defendants unsuccessfully argue that their services constituted reasonably equivalent value and fair consideration given to BLMIS in exchange for their salaries.   In support of this contention, the Defendants rely upon *Churchill I* where the court found the brokers provided value for the commissions they received by performing their duties.   256 B.R. at 667.   The Defendants posit that their salaries cannot be avoided since, they claim, the Trustee has not alleged their salaries "were disproportionate to like commissions paid for like services in the marketplace . . . by similar but legitimate business entities."   *Id.* at 679.   The Defendants are mistaken:  the Trustee has sufficiently alleged they breached fiduciary duties to BLMIS, and thus did not provide services that might otherwise have constituted adequate consideration in exchange for their receipt of salaries and bonuses.   *See* Section II.C. *infra*.

Notwithstanding the Defendants' arguments to the contrary, this conclusion is consistent with the decision in *Churchill I*.   There, the trustee sought to recover commissions paid to brokers by debtors for bringing investors into a Ponzi scheme, on the theory that services enlarging the scope of the debtors fraudulent scheme do not give value.   In rejecting the trustee's theory, the *Churchill I* court reasoned that the debtors' involvement in a fraudulent enterprise did not determine whether value was given under section 548 of the Code.   256 B.R. at 679.   The

focus, instead, should be on the specific transaction, and a court should concentrate on the "value of the goods and services provided rather than on the impact the goods and services had on the bankrupt enterprise." *Id.* at 680. The court in *Churchill I* went on to hold that because the trustee conceded there was nothing unlawful or fraudulent in the way the brokers were hired or carried out their duties, the brokers "earned what they were paid fairly and without wrongdoing," and the claims to recover their commissions dismissed as a matter of law. *Id.*

In contrast to *Churchill I*, where the brokers faithfully carried out their duties, the Trustee here takes direct aim at the "astronomical" compensation—including payments to Mark and Andrew of $4.8 million in 2006 and over $9 million in 2007—that was paid despite the Defendants' *failure to fulfill their employment duties*. Compl. ¶¶ 74, 85. Therefore, even if the Defendants' wages were proportionate to the wages of senior management in legitimate enterprises, a fact the Trustee does not concede, the Defendants returned less than reasonable equivalent value to BLMIS as a result of their alleged lack of faithful service. *See Churchill I*, 256 B.R. at 684 ("Nor shall this decision prejudice the Trustee's right to assert fraudulent conveyance claims based upon evidence showing that commissions were paid (for example, to insiders) that exceeded the value of broker services.").

In any event, the Court need not make a finding as to whether the Defendants' services constituted adequate value, as these issues often involve factual inquiries inappropriate for a motion to dismiss. *In re Actrade Fin. Techs. Ltd.,* 337 B.R. at 804 ("[T]he question of reasonably equivalent value . . . is fact intensive, and usually cannot be determined on the pleadings."). At this early stage, the Trustee has adequately pled a lack of reasonably equivalent value with regard to the transfers for purposes of section 548(a)(1)(B) of the Code and sections 273 through 275 of the NYDCL.

### ii. The Trustee Has Pled Nearly Every Constructive Fraudulent Transfer in Satisfaction of Rule 8(a)

In accordance with the liberal pleading requirements of Rule 8(a), "[t]he plaintiff need not provide specific facts to support its allegations." *Fabrikant*, 394 B.R. at 735 (quoting *Erickson v. Pardus*, 551 U.S. 89 (2007)). This is because Rule 8(a) does not require that "a complaint be a model of clarity or exhaustively present the facts alleged, as long as it gives each defendant fair notice of what the plaintiff's claim is and the facts upon which it rests." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 422 (S.D.N.Y. 2010) (internal quotations and citations omitted). Indeed, courts have found that allegations aggregating transfers into lump sums over several years without identifying the number of transfers, the dates of the transfers, or the amount of any specific transfer will satisfy Rule 8(a) pleading requirements. *See, e.g., The Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters., Inc. Inv. Litig.)*, 617 F. Supp. 2d 700, 722 (S.D. Ohio 2009) ("Though the complaint fails to specify the exact dates and amounts of the dividend payments, this claim is subject to Rule 8's liberal pleading standard . . . ."); *Fed. Nat'l Mortgage Ass'n,* 2006 WL 2802092, at *9 (finding complaint alleged constructively fraudulent transfers despite aggregating "the transfers into lump sums over three to five year time periods" without identifying the mechanism of the transfer).

Accordingly, many of the allegations underlying the Constructive Fraudulent Transfers in the Complaint satisfy the notice pleading standard of Rule 8(a), including a number of the allegations that aggregate these Transfers over several years. For instance, the Trustee's allegation that $6,645,000 was transferred to Mark's attorney in May and June of 2008 for the purchase of a Nantucket home provides sufficient information to apprise the Defendants of the

claim. [16]   Compl. ¶ 84.   The facts surrounding these Constructive Fraudulent Transfers provide Mark with sufficient notice of what the Trustee intends to prove;   namely, that a transfer of $6,645,000 for the purchase of a home is avoidable under the Code and the NYDCL because Mark provided less than reasonably equivalent value to BLMIS, while it was insolvent. Similarly, the Complaint aggregates Constructive Fraudulent Transfers over the six years (the "Six Year Aggregations"), and consequently fails to identify whether any of these Transfers, occurred within two years of the Filing Date.   For example, withdrawals by Mark and Andrew of at least $7.3 million from IA Accounts after April 2004, Compl. ¶¶ 80, 90, and transfers between 2002 and 2008 to pay for personal expenses charged to the Defendants' credit cards.   Compl. ¶¶ 73, 84, 94, 98.   While it is unclear what amount is sought as avoidable under the Code and what amount is sought under the NYDCL, the Defendants have notice of the Trustee's allegations that the Defendants provided insufficient value for the Six Year Aggregations at a time that BLMIS was insolvent.   As such, the allegations contain sufficient information for Defendants to prepare for litigation on the merits, satisfying Rule 8(a).   *See Fabrikant*, 394 B.R. at 736 (holding Rule 8(a) was satisfied despite the complaint aggregating transfers over "a period lasting nearly four years" and it was impossible to determine what amount was sought under the Code).

Other allegations are not as satisfactory.   Certain aggregations in the Complaint (the "Longer Aggregations")[17] include transfers that extend beyond any applicable look-back period[18]

---

[16] These are just illustrative examples of some of the many Constructive Fraudulent Transfers that have been adequately pled.  Only those identified in the following paragraphs have not been so pled.

[17] The Longer Aggregations include:  (1) the Defendants' salaries and bonuses between 2001 and 2008, Compl. ¶¶ 65, 74, 85, 96 (this does not include the $4.8 million dollar bonus to both Mark and Andrew in 2006 which has been properly pled under the NYDCL, and the bonus of over $9 million dollars to both Mark and Andrew in 2007 which has been properly pled under the Code and the NYDCL, Compl. ¶¶ 74, 85);  (2) transfers from BLMIS between 1996 and 2008 funding a life insurance policy for Peter, Compl. ¶ 73;  (3) payments on Peter's behalf between January 18, 2000 and April 11, 2006 to limited partnerships where Peter was an investor, Compl. ¶ 73;  (4) payments in 2002 to the Beacon Point Marine in Connecticut where Andrew kept a boat, Compl. ¶ 94; (5) payments in 2001 and 2002 to "Lock and Hackle," a fly fishing and hunting membership club in Miami, Florida on Andrew's

26

and it is unclear which ones, if any, the Trustee seeks to avoid as constructively fraudulent. Other transfers are listed in the Complaint without providing any date associated with the transfer (the "Undated Transfers"),[19] and this Court is unable to determine whether the Trustee is even seeking to avoid them as constructively fraudulent.  To the extent that the Court is unable to determine whether a transfer falls under the look-back period of any applicable law, the Trustee's claim to avoid it as a Constructive Fraudulent Transfer fails under Rule 8(a) to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson*, 551 U.S. at 93 (internal quotations omitted) (emphasis added).

While discovery is sometimes necessary to assist a trustee in clarifying the circumstances surrounding particular Constructive Fraudulent Transfers—for instance when the trustee has no access to the debtor's books and records or the books and records are in shambles—the Trustee here has not provided any such explanation.  Accordingly, the Motions to Dismiss the Trustee's Constructive Fraudulent Transfer claims are granted with respect to the Longer Aggregations and the Undated Transfers, with leave to amend the Complaint within forty five days.  As to the remainder of the Trustee's Constructive Fraudulent Transfer claims, the Motions to Dismiss are denied.

---

behalf, Compl. ¶ 94;  and (6) Shana's withdrawals of fictitious profits from her IA Account prior to December 2008, Compl. ¶ 97.

[18] In the context of constructive fraud, the New York discovery rule is not available to allow a plaintiff to avoid transfers occurring more than six years before the Filing Date.  *See Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 446 (S.D.N.Y. 2006) ("The statute of limitations for . . . constructive fraud is six-years, although unlike the case of actual fraud the two year discovery rule does not apply.");  *Williams v. Infra Commerc. Ansalt*, 131 F. Supp. 2d 451, 456 (S.D.N.Y. 2001) (holding constructive fraud claims under the NYDCL do "not receive the benefit of the discovery rule, since actual intent to defraud is not an element of that statute").

[19] The Undated Transfers are:  (1) payments from BLMIS to finance Peter's, Mark's, and Andrew's ownership stakes in Madoff Brokerage Trading and Technology, LLC, Compl. ¶ 73, 84, 94;  (2) payment by BLMIS of to fund Peter's share of a capital call by Madoff Technologies, LLC, Compl. ¶ 73;  and (3) payments by MSIL for the purchase and restoration of Peter's Aston Martin automobile, Compl. ¶ 73.

### iii. Section 546(e) Does Not Provide a Basis for Dismissing The Trustee's Constructive Fraudulent Transfer Claims

Mark and Andrew unsuccessfully argue their withdrawals of fictitious profits are insulated from liability by the "safe harbor" of section 546(e) of the Code, which provides, in relevant part, that "the trustee may not avoid . . . [a] settlement payment . . . made by or to (or for the benefit of) a . . . stockbroker . . . in connection with a securities contract." 11 U.S.C. § 546(e). "Settlement payment" is defined as a "preliminary settlement payment, a partial settlement payment, an interim settlement payment . . . or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). A "stockbroker" is a person who has a customer and "that is engaged in the business of effecting transactions in securities." 11 U.S.C. § 101(53A)(A), (B). A "securities contract" is defined as, *inter alia*, "a contract for the purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i)-(xi). Mark and Andrew contend that the Constructive Fraudulent Transfers made from their IA Accounts are settlement payments by a stockbroker pursuant to a securities contract, and thus cannot be avoided. *See* Memorandum of Law in Support of Defendants Mark and Andrew Madoff's Motion to Dismiss at p. 38, 39 (No. 09-01503) (dated March, 15, 2010) (Dkt. No. 13) [Hereinafter "Mark and Andrew Mot."].

In *Merkin I*, this Court addressed virtually identical arguments, and found that they were at best premature, as section 546(e) provides an affirmative defense that, unless clearly established on the face of the Complaint, does not tend to controvert the Trustee's *prima facie* case. 440 B.R. at 266; *see also Merkin II*, 2011 WL 3897970, at *12 ("This Court finds no substantial grounds for difference of opinion as to the correctness of the standards relied on by the Bankruptcy Court in its refusal – at the pleading stage – to dismiss on the grounds of . . . 546(e) [is an] affirmative defense."); *DeGirolamo v. Truck World, Inc. (In re Laurel Valley Oil Co.)*, No. 07–6109, 2009 WL 1758741 (Bankr. N.D. Ohio June 16, 2009). Assuming, *arguendo*,

that the section 546(e) defense were timely, the Court cannot find as a matter of law that it applies to the transactions at issue.    Whether Madoff, through BLMIS, was a stockbroker "engaged in the business of effecting transactions in securities" is dubious.    11 U.S.C. § 101(53A)(B).    Courts have held that Ponzi scheme operators do not affirmatively "make securities transactions happen" on behalf of legal "customers," and thus do not fit the definition of "stockbroker" for purposes of section 546(e).  *See Johnson v. Neilson* (*In re Slatkin*), 525 F.3d 805, 817 (9th Cir. 2008);  *Wider v. Wootton*, 907 F.2d 570, 573 (5th Cir. 1990).    As asserted in the Complaint, Madoff, through BLMIS, "never in fact purchased any of the securities he claimed to have purchased for customer accounts."    Compl. ¶ 25;  *see Merkin II*, 2011 WL 3897970, at *12 (finding "no substantial grounds for difference of opinion" with this Court's determination in *Merkin I* that Madoff is not a stockbroker as a matter of law);  *see also Merkin I*, 440 B.R. at 266-68.

For the same reason, it is doubtful whether the payments from BLMIS to the Defendants are settlement payments as contemplated by the statute.    Settlement payments subject to the safe harbor of section 546(e) must be made in the context of a "securities transaction."  *See In re Enron Creditors Recovery Grp. v. Alfa, S.A.B. de C.V.*, 09-5122, 09-5142, 2011 WL 2536101, at *7 (2d Cir. June 28, 2011) (noting "[w]e like our sister circuits, agree that in the context of the securities industry a settlement refers to the completion of a securities transaction . . . .") (internal quotations omitted);  *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009); ("[A] settlement payment is generally the transfer of cash or securities made to complete the securities transaction.") (internal quotations and citations omitted);  *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir. 1990) (explaining settlement is "the completion of a securities transaction");  *Jackson v. Mishkin (In re Adler, Coleman Clearing*

*Corp.)*, 263 B.R. 406, 475 (S.D.N.Y. 2001) ("The term 'settlement' as commonly used in connection with purchases and sales in the securities trade refers to acts that occur at different states of the process towards completion of the securities transaction.").   While the Second Circuit recently defined "transaction in securities" broadly, *In re Enron Creditors Recovery Group*, 2011 WL 2536101, at *6-7 (holding settlement payment does not require change in ownership of the security and limiting the requirement of "commonly used in the securities trade" in connection with settlement payments), it suggested that "settlement payments" must be made in relation to an actual securities transaction, *id.* at *7 ("Because Enron's redemption payments *completed a transaction in securities*, we hold that they are settlement payments within the meaning of § 741(8).") (emphasis added);   *see also Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc., v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, No. 08–01417, 2011 WL 3157292, at *11 (Bankr. S.D.N.Y. July 27, 2011) ("The practical effect of the [Enron] opinion is to make it more difficult for a plaintiff . . . to maintain a viable cause of action for avoidance in relation to prepetition transfers made to complete *a transaction involving a security*.") (emphasis added).   Here, where securities may never have been bought, sold, or otherwise existent at BLMIS, withdrawals from IA Accounts may not constitute "settlement payments" under section 546(e) of the Code.   Certainly in this case, where the Defendants received astronomical returns on comparably negligible investments,[20] the Trustee is entitled to discovery in order to ascertain the extent of the Defendants' knowledge about the fraudulent activities affecting their IA Accounts.

---

[20] Specifically, Andrew invested only $912,062 into IA Accounts, yet he redeemed $17,117,566;  Mark invested only $745,482 into IA Accounts, yet he redeemed $18,105,456;  Peter invested only $32,146 into IA Accounts, yet he redeemed $16,252,004;  and Shana invested only $1,364,975 into IA Accounts, yet she redeemed $1,666,436.  Compl. ¶¶ 66, 76, 86, 97.  Additionally, some IA Accounts showed purported gains despite lacking any principal to support such gains.  Compl. ¶¶ 67, 77-80, 87-90.

Additionally, even if BLMIS were a stockbroker, the Court is unable to conclude that a "securities contract" ever existed.  The Defendants do not explain what qualifies as an investment contract in this case and merely conclude that "the Bankruptcy Code's definition of a 'securities contract' certainly covers the transactions here."  Mark and Andrew Mot. at p. 39. Surely the IA Account agreements are not investment contracts as a matter of law;  this Court has previously questioned whether they effect "the purchase, sale, or loan of a security" between the parties or contemplate any particular security transaction.  11 U.S.C. § 741(7)(A).  At most, they merely authorize Madoff to act as "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities" in the future on the Fund Defendants' behalf.  *See Merkin I*, 440 B.R. at 267.

Moreover, as this Court has previously held, the application of section 546(e) must be rejected as contrary to the purpose of the safe harbor provision and incompatible with SIPA. Section 546(e) was intended to promote stability and instill investor confidence in the commodities and securities markets.  *Merkin I*, 440 B.R. at 267 (citing H. Rep. No. 97–420, at 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583 (stating the purpose of 546(e), as amended, is to protect "the stability of the market"));  *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 105 (Bankr. S.D.N.Y. 1999) (stating that a goal of 546(e) is to "promote investor confidence").  Courts have held that to extend safe harbor protection in the context of a fraudulent securities scheme would be to "undermine, not protect or promote investor confidence . . . [by] endorsing a scheme to defraud SIPC," and therefore contradict the goals of the provision.  *Id.* (declining to extend section 546(e)'s safe harbor protection to a party implicated in a fraudulent scheme).  Further, in the context of a SIPA proceeding, applying the safe harbor provision would negate its remedial purpose by eliminating most avoidance powers granted to a

trustee under SIPA.  *See* 15 U.S.C. §§ 78fff(b), 78fff–2(c)(3).[21]  Simply put, the Constructive

Fraudulent Transfers sought to be avoided emanate from Madoff's massive Ponzi scheme, and

the safe harbor provision does not insulate transactions like these from attack.  Indeed, it defies

credulity that the Defendants, who are insiders on the basis of the facts alleged, were ever

contemplated to be the parties eligible to invoke the safe harbor provision under section 546(e).

In light of the foregoing, I hold that the Defendants' arguments under section 546(e) fail to

establish a basis for dismissing the Trustee's Constructive Fraudulent Transfer claims.

### D.   The Trustee Has Failed To Adequately Allege Preference Claims

The Trustee has insufficiently pled Count Two of the Complaint to avoid and recover

Preferences.

### i.   The Trustee Has Adequately Pled the Statutory Elements of a Preference Claim

Section 547(b) of the Code provides that a trustee may avoid a transfer from BLMIS, if

the transfer is made to or for the benefit of a creditor, for or on account of an antecedent debt,

while the debtor was insolvent, and within one year before the date of the filing of the petition if

the creditor was an insider, as well as allows such creditor to receive more than it would in a

chapter 7 liquidation.  11 U.S.C. § 547(b).  Claims to avoid and recover preferential payments

are not held to the heightened pleading requirements of Rule 9(b).  *See Family Golf Ctrs., Inc. v.*

*Acushnet Co. (In re Randall's Island Family Golf Ctrs.)*, 290 B.R. 55, 64 (Bankr. S.D.N.Y.

2003).  Accordingly, under Rule 8(a), the Trustee must provide only a "short and plain statement

of the claim showing that [he] is entitled to relief."  FED. R. CIV. P. 8(a)(2).

The Trustee has adequately pled the requisite elements with regard to the Preferences.

The Trustee has sufficiently alleged the Defendants are insiders of BLMIS subject to a one-year

---

[21] Significantly, in the context of a SIPA proceeding, the Code provisions, including section 546(e), are incorporated only "*to the extent consistent with the provisions of [SIPA]*."  SIPA § 78fff(b) (emphasis added).

preference look back period, as all of the Defendants are close relatives of Madoff and were officers or senior managers at BLMIS. *See* 11 U.S.C. § 101(31)(B) (defining insiders of a corporate debtor to include officers of the debtor and "relative[s] of a general partner, director, officer, or person in control of the debtor"). Additionally, as discussed above, Ponzi schemes are presumptively insolvent, and the Trustee need not allege specific facts supporting the insolvency of BLMIS at the times of the preferential transfers. Finally, the Trustee alleges the Preferences were compensation for services performed by the Defendants prior to payment, and suffice to show the payments were to a creditor on account of an antecedent debt. *See Pryor v. Cohen (In re Blue Point Carpet, Inc.)*, 102 B.R. 311, 320-21 (E.D.N.Y. 1989) (finding that salary payments paid on the date due were avoidable preferences).[22]

### ii. The Trustee Has Not Identified the Preferences with Sufficient Information

The Trustee's Preference claims fail to provide the minimum information required by Rule 8(a). The Trustee's allegations aggregate the transfers into a lump sum without specifying the number of Preferences, the amount of any specific Preference, or which defendant received any specific Preference.[23] While Rule 8(a) does not require specific factual detail, such bare allegations fail to provide sufficient notice for the Defendants to prepare an answer or affirmative defenses, such as whether the transfer was made in the ordinary course of business or whether

---

[22] Salary payments are often subject to the affirmative defenses enumerated in section 547(c) of the Code, such as transfers made in the ordinary course of business. *See* 11 U.S.C. § 547(g) ("[T]he creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section."); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 39 (2d Cir. 1996) ("A creditor asserting the [ordinary course of business] defense bears the burden of proving each of the three elements by a preponderance of the evidence."). As no Defendant has raised these affirmative defenses and their applicability is not clear from the face of the Complaint, the court need not address at this time whether they apply to defeat the Preference claims.

[23] The only allegation in the Complaint specific to the Preferences is that "the compensation payments received by the four . . . Defendants during the period from December 11, 2007 [to] the Filing Date in the collective amount of $7,364,048 were made during the one year period prior to the Filing Date and are additionally recoverable as avoidable preference payments . . . ." Compl. ¶ 108. The Complaint does not contain any facts or allegations that sufficiently detail the specific transfers made within one year of the Filing Date.

there was a contemporaneous exchange for new value. *See State Bank and Trust Co. v. Spaeth (In re Motorwerks, Inc.)*, 371 B.R. 281, 293-94 (Bankr. S.D. Ohio 2007). The allegations here are dissimilar to the trustee's allegations in *Court-Appointed Receiver for Lancer Management Group LLC v. 169838 Canada, Inc.*, where the court found that the Complaint contained sufficient factual information despite "lumping" the defendants together without identifying the transfers attributable to each Defendant. No. 05-60235-CIV, 2008 WL 2262063, at *3 (S.D. Fla. May 30, 2008). In that case, the complaint contained an exhibit indicating the particular transfers from particular funds on particular dates, and accordingly provided sufficient information for the defendants to form an answer despite not identifying which defendant received which transfer. Here, by contrast, the Preferences and the Defendants are both grouped together without any specifics provided. Again, while dismissal might not be required in all such circumstances, the Trustee has not come forth with any explanation for these minimalistic pleadings. The Trustee's Preference claims in Count Two are therefore dismissed with leave to amend within forty five days.

### E. The Trustee Fails to Adequately Plead his Claims To Recover Subsequent Transfers From the Defendants

The Trustee has insufficiently pled Count Ten of the Complaint to recover funds subsequently transferred to the Defendants (the "Subsequent Transfers") under section 550(a)(2) of the Code and section 278 of the NYDCL. *See* 11 U.S.C. § 550(a)(2) (allowing recovery from "any immediate or mediate transferee of such initial transferee"); NYDCL § 278 (allowing recovery from "any person"); *Farm Stores, Inc. v. Sch. Feeding Corp.*, 477 N.Y.S.2d 374, 255 (N.Y. App. Div. 1984) ("*[E]ach transferee . . . is liable to the creditor to the extent of the value of the money or property he or she wrongfully received.*") (emphasis added).

In determining whether a claim to recover fraudulent transfers from a subsequent

transferee is adequately pled, Rule 8(a) governs. *Stratton Oakmont, Inc.*, 234 B.R. at 317–18 ("[R]ecovery under § 550(a) is not subject to a particularized pleading standard . . . ."); *see Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007) (indicating "in order to prove a Section 550(a)(2) claim, [the] burden is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue" and that "if dollar-for-dollar accounting is not required at the proof stage, then surely it is not required at the pleading stage either"). The purpose of this pleading requirement is to ensure the defendant receives "fair notice of what the. . . claim is and the grounds upon which it rests." *In re Henderson,* 423 B.R. at 612 (internal quotations omitted).

Here, the Complaint merely alleges that "[o]n information and belief, some or all of the transfers were subsequently transferred by one or more [of the Defendants] to another Family Defendant, either directly or indirectly" without providing any sort of estimate of the amount of the purported Subsequent Transfer, or when or how such Transfer occurred. Compl. ¶ 167. While the Complaint's failure to indicate specific amounts does not in and of itself warrant dismissal of the Subsequent Transfer claims, *K.E.R.U. Realty Corp.*, 379 B.R. at 30–31 (finding a subsequent transfer claim adequately pled where the complaint stated, "at least tens of millions of dollars were fraudulently diverted from [debtor] to [initial transferees] . . . [and] a portion of these fraudulently diverted funds was transferred from the [initial transferees] to, or for the benefit of, the [subsequent transferees]"), its failure to provide even a modicum of specificity with respect to the Subsequent Transfers so as to put the Defendants on notice as to which ones the Trustee seeks to recover does so warrant. *See Gowan v. Amaranth LLC (In re Dreier LLP),* No. 10-03493, 2011 WL 2412601, at * 11 (Bankr. S.D.N.Y. June 16, 2011).

The *Amaranth* court held similarly vague allegations to be insufficient to sustain a subsequent transfer claim. 2011 WL 2412601, at * 11 ("The only scintilla of evidence put forth by the Trustee is a bald assertion that 'it is likely that Amaranth Partners invested the money DLLP transferred to it pursuant to the Note Fraud to Amaranth LLC. . . . The Trustee merely asserts that '*[o]n information and belief,* Amaranth Partners transferred its Transfers to Amaranth LLC.'") (emphasis in the original). To arrive at this conclusion, the *Amaranth* court distinguished the facts alleged by the trustee in that case from those alleged by this Trustee in *Merkin I* and concluded that in *Merkin I,* "the complaint satisfied the Rule 8(a) pleading requirement because it provided 'fair notice' to the defendants of the claims against them because certain exhibits attached to the complaint indicated the percentage of fees and commissions that the defendants purported to receive on account of the transfers to an initial transferee." *Amaranth,* 452 B.R. at 465 (citing *Merkin I*, 440 B.R. at 270). Indeed, the complaint in *Merkin I* identified the subsequent transfers in predetermined amounts in the Funds' Offering Memoranda, which was attached as an exhibit, and "thus adequately apprises the Merkin Defendants, the alleged recipients of these fees, of which transactions are claimed to be fraudulent and why, when they took place, how they were executed and by whom." 440 B.R. at 270 (internal quotations omitted). No such information is provided here.

Accordingly, Count Ten of the Complaint to recover Subsequent Transfers is dismissed with leave to amend within forty five days.

### F.    The Trustee has Sufficiently Pled a Basis For Disallowing the Defendants' SIPA Claims

The Trustee has sufficiently pled Count Eleven of the Complaint to disallow the Defendants' SIPA claims under section 502(d) of the Code, which states, "the court shall disallow any claim of any entity . . . that is a transferee of a [voidable] transfer." 11 U.S.C. §

502(d).  The purpose of this section is to "preclude entities that have received voidable transfers from sharing in the distribution of assets unless and until the voidable transfer has been returned to the estate."  *In re Mid. Atl. Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986);  *see also In re MacMenamin's Grill Ltd.*, 450 B.R. 414 (Bankr. S.D.N.Y. 2011) (recognizing the distinction between "transfer" and "obligation" as relevant to a determination of the applicability of section 502(d)) (citing *In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 204 (Bankr. S.D.N.Y. 2005)). The Defendants are allegedly "the recipients of transfers of BLMIS' property which are recoverable" under the Code and SIPA, and those transfers have not been returned to the Trustee. Compl. at ¶ 174 (emphasis added).  As a result, the Trustee's claim under section 502(d) of the Code is adequately pled.   The Motions to Dismiss Count Eleven of the Complaint are therefore denied.

### G.    The Trustee Has Adequately Alleged a Claim for Equitable Subordination of the Defendants' SIPA Claims

The Trustee has sufficiently pled Count Twelve of the Complaint to equitably subordinate the Defendants' SIPA claims, pursuant to section 510(c) of the Code, which empowers this Court to "subordinate for the purposes of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c).

"To plead equitable subordination successfully, a complaint must contain enough facts to satisfy each part of the following three-part test:  (1) that the [Defendants] engaged in inequitable conduct, (2) that the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant-claimant, and (3) that bestowing the remedy of equitable subordination is not inconsistent with bankruptcy law."  *In re Hydrogen, L.L.C.,* 431 B.R. 337, 358 (Bankr. S.D.N.Y. 2010) (citing *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir. 1977)).  Such subordination is confined to offsetting "specific harm that creditors have suffered on account of the inequitable

conduct;" it "is remedial, not penal." *In re SubMicron Sys. Corp.*, 291 B.R. 314, 327-29 (D. Del. 2003); *see also Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425, 434 (S.D.N.Y. 2007). Thus, undoing inequality is at the core of 510(c)'s grant of authority. *Societa Internazionale Turismo, S.p.A v. Barr (In re Lockwood)*, 14 B.R. 374, 380-81 (Bankr. E.D.N.Y. 1981). ("The fundamental aim of equitable subordination is to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of bankruptcy results.") (internal quotations omitted).

The Complaint is replete with allegations that the Defendants have left much to undo. *See* Comp ¶¶ 28-29, 32, 37-39, 43, 45, 47-49, 51-58, 73, 94, 98, 182. As explained in-depth below, the Complaint sufficiently alleges that the Defendants breached their fiduciary duties to BLMIS and those breaches directly harmed the same. *See* Section II.C. *infra*; *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc., (In re KDI Holdings, Inc.)*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 2009) (observing that the remedy of equitably subordination has been applied in cases, where it was found that the defendants breached their fiduciary duties). It additionally alleges that the Defendants were unjustly enriched at the expense of BLMIS due to their failures to adequately perform these duties. *See* Section II.E. *infra*. These factual allegations set out the Defendants' "inequitable conduct" injurious to creditors, and moreover, these allegations establish that the remedy of equitable subordination in this instance would not be inconsistent with bankruptcy law. *See Adelphia Commc'ns Corp. v. Bank of Am.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 67 (Bankr. S.D.N.Y. 2007). Thus, in the event one exists, any allowed interest of the Defendants in the BLMIS SIPA Liquidation should be equitably subordinated. Accordingly, the Motions to Dismiss count twelve of the Complaint are denied.

* * *

For the foregoing reasons, the Motions to Dismiss the Bankruptcy Claims are denied except with regard to the Trustee's Preference claims in Count Two, Actual and Constructive Fraudulent Transfer claims in Counts Three through Nine to the extent stated herein, and Subsequent Transfer claims in Count Ten, with leave to amend the Complaint within forty five days.

## II.   THE COMMON LAW CLAIMS

Through the Common Law Claims the Trustee seeks to recover damages suffered by BLMIS as a result of the Defendants' failure to perform duties arising from their management roles at BLMIS.   To support these Claims, the Complaint alleges that the Defendants were directors, officers, managers, and fiduciaries with broad oversight of BLMIS as a whole, and that their responsibilities included developing and implementing a supervisory system to prevent and report any fraudulent activity occurring within BLMIS.   Specifically, according to BLMIS's purported compliance policies, the Defendants were required to "respond to red flags," closely scrutinize "any aberrational activity," and "monitor . . . the activities of BLMIS personnel to ensure that the policies and procedures . . . [were] being followed."  Compl. ¶ 33.   The Trustee alleges the Defendants failed to implement and comply with these policies, thereby directly enabling Madoff's Ponzi scheme to continue undetected to the detriment of BLMIS.

Before reaching the merits of the Common Law Claims, the Court must first determine whether the Trustee has standing to assert them, and second, if he does, whether New York General Business Law §§ 352 *et. seq.,* commonly referred to as the Martin Act, otherwise preempts him from bringing them.  N.Y. Gen. Bus. Law. §§ 352 *et. seq.* (McKinney 2010).  As set forth below in greater detail, this Court finds the Trustee has standing to assert Common Law

Claims on behalf of the BLMIS estate, and the Martin Act does not preempt him from pursuing them against the Defendants.

**A.    The Trustee Possesses Standing to Pursue the Common Law Claims on behalf of the BLMIS Estate**

Given the "hybrid" nature of a SIPA liquidation, *In re BLMIS II*, 2011 WL 3568936, at *12 n. 10, a SIPA trustee has at least as many powers and responsibilities as an ordinary bankruptcy trustee under Title 11.  *See also* 15 U.S.C. § 78fff–1(a) ("A trustee shall be vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11.").  An ordinary bankruptcy trustee, pursuant to Second Circuit precedent, has standing to assert claims against corporate insiders alleging injury to the debtor. *In re The Mediators, Inc.*, 105 F.3d 822, 826-27 (2d Cir. 1997) ("We agree that a bankruptcy trustee, suing on behalf of the debtor under New York law, may pursue an action for breach of fiduciary duty against the debtor's fiduciaries.");  *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 702 n. 3 (2d Cir. 1989) (finding that "causes of action that could be asserted by the debtor are property of the estate and should be asserted by the trustee. . . .");  *In re Keene Corp.*, 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994) ("Section 720 of New York's Business Corporation law expressly authorizes a corporation or bankruptcy trustee to sue the corporation's officers and directors for breach of fiduciary duty, including misappropriation or diversion of assets. . . .").  The rationale for this is plain: section 541(a)(1) of the Code defines property of the estate as "all legal or equitable interests of the debtor . . . as of the commencement of the case" including the estate's causes of action. *In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9 (1983)).  It follows, therefore, that the Trustee has

standing to assert the Common Law Claims, to the extent these Claims belong to the BLMIS estate.[24]

In *HSBC*, the Trustee, as successor in interest to Madoff and BLMIS, lacked standing under the *Wagoner* rule[25] to bring common law fraud claims against the defendants (the "HSBC Defendants"). 2011 WL 3200298, at *2. The allegations presented here do not compel the same conclusion. Indeed, the HSBC Defendants were undisputedly third parties and *Wagoner* provides, "a claim *against a third party* for defrauding a corporation accrues to creditors, not to the guilty corporation." 944 F.2d at 114 (emphasis added); *see also In re Verestar, Inc.*, 343 B.R. 444, 479 (Bankr. S.D.N.Y. 2006) ("[A] plaintiff acting on behalf of a debtor cannot sue *an outside professional or other third party* for damages for which the corporation itself can be held responsible.") (emphasis added). By contrast, the Defendants in the instant proceeding are alleged to be fiduciaries and insiders of BLMIS, and it is well established that the *Wagoner* and *in pari delicto* rules do "not apply to actions of fiduciaries who are insiders in the sense that they either are on the board or in management, *or in some other way control the corporation*." *In re Optimal U.S. Litg.,* No. 10 Civ. 4095, 2011 WL 3809909, at *9 (S.D.N.Y. Aug. 26, 2011) (internal quotations omitted)(emphasis in the original); *Winnick*, 2006 WL 2212776, at *15

---

[24] The district court in *Picard v. HSBC Bank PLC* held that the Trustee lacks standing—both directly and under theories of bailment, subrogation, assignment or contribution—to assert common law claims against third parties *on behalf of BLMIS customers*. Nos. 11 Civ.763, 11 Civ. 836, 2011 WL 3200298, at *3 (S.D.N.Y. July 28, 2011). Here, although Common Law Claims appear to have been asserted on behalf of customers and the BLMIS estate, *see, e.g.*, Compl. ¶¶ 182, 184 (alleging breach of fiduciary duty owed to, and damages caused to, "BLMIS and its customers"), the Trustee has since insisted that he "is not suing [the Defendants] on behalf of the firm's customers but on behalf of the firm itself for [the Defendants'] failures to carry out faithfully their duties to BLMIS." Trustee's Supplemental Letter at 2. In light of this supplemental submission, and in accordance with the holding in *HSBC*, this Court need only address the plausibility of the Trustee's Common Law Claims to the extent they are asserted on behalf of the BLMIS estate.

[25] The *Wagoner* rule "deprive[s] a trustee from even having standing to bring in federal court a common law claim that is clearly defeated by the doctrine of *in pari delicto*." 2011 WL 3200298, at *2 (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991)). Under New York law, the doctrine of *in pari delicto* operates as an affirmative defense whereby a wrongdoer, or a plaintiff asserting a claim on behalf of a wrongdoer, is generally barred from recovering against a commensurate wrongdoer. *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 958–59 (N.Y. 2010).

("Courts have held that the Wagoner and "in pari delicto" rules do not apply to claims against corporate insiders for breach of their fiduciary duties.") (citing *In re the Mediators, Inc.*, 105 F.3d at 826-27); *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 425 (Bankr. S.D.N.Y. 2005) ("[T]he *Wagoner* Rule does not bar claims against corporate fiduciaries . . . ."); *Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563, 577 n.23 (Bankr. S.D.N.Y. 2003) ("The *Wagoner* Rule only deals with claims against third parties.  It does not proscribe actions against insiders for breach of fiduciary duty, which are properly claims of the trustee."); *KDI Specialty Foods v. Austin Fin. Serv., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999) ("[T]he *in pari delicto* doctrine is inapplicable where a cause of action is brought against an insider.").[26]  Consequently, to the extent that the Trustee has established the Defendants' positions at BLMIS rendered them insiders and fiduciaries, he is not barred by *Wagoner* or *in pari delicto* from asserting claims against them on behalf of BLMIS.

General partners, sole shareholders, and sole decision makers are "insiders" or fiduciaries in the context of the *in pari delicto* doctrine under New York common law.  *In re Adelphia Communs. Corp.,* 322 B.R. 509, 529 n. 18 (Bankr. S.D.N.Y. 2005) (holding general partner was insider who could not use *in pari delicto* defense); *Granite Partners, L.P., v. Bear, Stearns & Co., Inc.,* 17 F. Supp. 2d 275, 308 (S.D.N.Y. 1998) (holding sole voting shareholders and sole general partners are insiders whose wrongdoing is imputed to plaintiff).  "No reported authority

---

[26] The rationale for the insider exception to the *in pari delicto* doctrine stems from the agency principles upon which the doctrine is premised;  a corporate insider, whose wrongdoing is typically imputed to the corporation, should not be permitted to use that wrongdoing as a shield to prevent the corporation from recovering against him. *Official Comm. of Unsecured Creditors v. Shapiro (In re Walnut Leasing Co.)*, No. 99–526, 1999 WL 729267, at *5 (E.D. Pa. Sept. 8, 1999) ("Vis-à-vis their corporations, insiders cannot avoid the consequences of their own handiwork."). Indeed, a corporation "is represented by its officers and agents," and "all [of their] corporate acts—including fraudulent ones—are subject to the presumption of imputation" to the corporation.  *Kirschner*, 938 N.E.2d at 951(internal quotations omitted);  *see also In re Oakwood Homes Corp.*, 356 Fed. Appx. 622, 627 n.4 (3rd Cir. 2009) ("The exception derives from the fact that corporations act through their directors, officers, and controlling stockholders.");  *Granite Partners, L.P. v. Bear, Stearns & Co. Inc. (In re Granite Partners, L.P.)*, 194 B.R. 318, 332 (Bankr. S.D.N.Y. 1996) ("*In pari delicto*. . .does not apply to corporate insiders or partners.  Otherwise, a trustee could never sue the debtor's insiders on account of their own wrongdoing.").

suggests an *officer or director* can assert the defense of *in pari delicto*" to escape liability to the corporation on whose behalf he or she acted. *In re Walnut Leasing Co.*, 1999 WL 729267, at *5, n. 12 (emphasis added). Even a third-party professional, typically the quintessential outsider, may surrender an *in pari delicto* defense where it exerts sufficient domination and control over the guilty corporation to render itself an insider. *See, e.g.*, *In re KDI Holdings, Inc.*, 277 B.R. at 518 ("[T]he Committee has alleged sufficient facts with regard to Austin's and Schneider's insider status through domination and control to render the *in pari delicto* defense inapplicable in this case"); *see also In re IDI Constr. Co., Inc.*, 345 B.R. 60, 67 (Bankr. S.D.N.Y. 2006) (holding that *in pari delicto* did not bar a claim against a consultant involved in the fraud).

The Complaint alleges that the Defendants were senior officers, directors, and compliance managers of BLMIS. Comp. ¶¶ 28-36. Peter, an experienced and licensed investment and legal professional, held the title of Senior Managing Director and Chief Compliance Officer of BLMIS and was designated principal responsible for supervising BLMIS personnel in the absence of Madoff himself. Comp. ¶¶ 37-42. Mark and Andrew, also investment professionals, held titles of Co-Directors of Trading at BLMIS, and were designated as personally responsible for carrying out the Firm's policy in Madoff's absence. Comp. ¶¶ 47-51. Shana was in-house Counsel and Compliance Director of BLMIS and the sole custodian for most BLMIS compliance documents and regulatory materials; she was responsible for overseeing compliance with firm policy as well as investigating and correcting reported aberrational activity. Comp. ¶¶ 43-46. These and other similar allegations set forth in Complaint suffice to establish, for relevant purposes, that the Defendants were fiduciaries and insiders of BLMIS. *See Kirschner*, 938 N.E.2d at 951.

Accordingly, the *Wagoner* rule and the *in pari delicto doctrine* do not bar the Trustee from asserting Common Law Claims on behalf of BLMIS against the Defendants.

### B.   The Trustee's Common Law Claims are Not Preempted by New York's Martin Act

For the better part of a century, the Martin Act has empowered the New York State Attorney General to take action against fraudulent practices involving securities.  *See Anwar,* 728 F. Supp. 2d at 359.  When originally enacted in 1921, the Martin Act granted the Attorney General the power "to bring actions to enjoin imminent frauds" but "failed to address fraudulent activities that had been already completed."  *Assured Guar. (UK) Ltd., v. J.P. Morgan Inv. Mgt. Inc.*, 915 N.Y.S.2d 7, 11 (N.Y. App. Div. 2010).  This changed, however, in 1955 with the enactment of section 352-c, which authorizes the Attorney General to institute criminal and civil proceedings, predicated "on mere conduct, absent any proof of scienter or criminal intent."  *Id*. As the Martin Act currently stands, these statutory powers remain available under section 352-c, provided, however that the Attorney General limits all Martin Act prosecutions to:

(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
(b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
(c) Any representation or statement which is false, where the person who made such representation or statement:  (i) knew the truth;  or (ii) with reasonable effort could have known the truth;  or (iii) made no reasonable effort to ascertain the truth;  or (iv) did not have knowledge concerning the representations or statements made.

N.Y. Gen. Bus. Law. § 352-c (McKinney 2010).

The Common Law Claims arise from the Defendants' alleged derelictions of internal management duties and misuses of company funds unrelated to any specific investment accounts under management or any particular investment advice or decision.  *See* Compl. ¶¶ 28-36, 42, 46, 49, 52-58.  Thus, absent allegations of one of the types of conduct prohibited by the Martin Act—fraud, deception, unreasonable future promise, or false representation related to the sale of

security—these Claims do not implicate its plain language. *See Assured Guar. (UK) Ltd.,* 915 N.Y.S.2d at 12 ("The plain language of the Martin Act does not explicitly preempt all common-law claims.").

The Defendants nevertheless contend that if the Common Law Claims were permitted to go forward, the policy underlying the Martin Act would be undermined or otherwise compromised. They explain that the Martin Act grants the New York Attorney General exclusive power over all claims arising out of securities fraud, and thus "[t]o allow private plaintiffs to bring common law claims related to the Martin Act would detract from the New York State Attorney's exclusive enforcement power over the Act." Mark and Andrew Mot. at 12. To support their position, the Defendants rely on decisions issued by federal courts in the Southern District of New York that have held that the Martin Act precludes a private right of action for any non-fraud tort claim that arises in the securities context and lacks a scienter element. *See, e.g.*, *In re Beacon Assoc's. Litig.*, 745 F. Supp. 2d 386, 431 (S.D.N.Y. 2010)*; Abbey v. 3f Therapeutics, Inc.*, No. 06 Civ. 409, 2009 WL 4333819, at *14 (S.D.N.Y. Dec. 2, 2009); *Pro Bono Invs., Inc. v. Gerry*, No. 03 Civ. 4347, 2005 WL 2429787, at *16 (S.D.N.Y. Sept. 30, 2005); *Sedona Corp. v. Landenbury Thalman & Co., Inc.*, No. 03 Civ. 3120, 2005 WL 1902780, at *21-23 (S.D.N.Y. Aug. 9, 2005). These decisions, however, represent only one side of an ongoing debate among federal and state courts in New York over the Martin Act's preemptive effect. The other side of the debate, which the New York Attorney General has joined,[27] holds that neither the plain language of the Martin Act nor its legislative intent supports

---

[27] In at least two separate amicus curiae briefs filed in New York courts, the Attorney General has taken the position that the Martin Act does not preempt any private right of action in the investment securities context. Brief for the Attorney General of the State of New York as Amicus Curiae, *CMMF, LLC v. J.P. Morgan Inv. Mgt. Inc.*, 915 N.Y.S.2d 2 (N.Y. App. Div. 2010) (No. 601924/09); Brief for the Attorney General of the State of New York as Amicus Curiae, *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgt. Inc.*, 915 N.Y.S.2d 7 (N.Y. App. Div.2010)(No. 603755/08).

preemption of all non-fraud common law claims.  *See, e.g.*, *Anwar,* 728 F. Supp. 2d at 365; *Assured Guar. (U.K.) Ltd.*, 915 N.Y.S.2d at 15;  *CMMF, LLC v. J.P. Morgan Inv. Mgt. Inc.*, 915 N.Y.S.2d 2, 6 (N.Y. App. Div. 2010);  *Caboara v. Babylon Cove Dev.*, 862 N.Y.S.2d 535, 538–39 (N.Y. App. Div. 2008).

Here, because "the Attorney General has, by operation of statute, no enforcement power," it is "difficult to see how permitting a common law claim to go forward would interfere with the state's legislature's enforcement mechanism."  *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767, 2003 WL 22052894, at *5 (S.D.N.Y. Sept. 2, 2003) *see also Hecht v. Andover Assocs. Mgmt. Corp.*, 910 N.Y.S. 2d 405, *9 (N.Y. Sup. 2010) (finding that fiduciary duty and other common law claims arising from Madoff-related matters were not based on the type of misconduct that the Attorney General prosecutes as Martin Act violations, and thus were not preempted by the Martin Act).  Indeed, the Common Law Claims are not based on fraud, deception, unreasonable future promise, or false representation, but instead on allegations that the Defendants failed to carry out their compliance and supervisory responsibilities and improperly used company funds for personal use.  Similar circumstances arose in *Lourous v. Kreicas*, 367 F. Supp. 2d 572, 595-96 (S.D.N.Y. 2005), which involved various common law claims against an investment advisor who had discretionary authority over the investments of his client.  There, the court determined that the claims for breach of fiduciary duty were based on "failures to manage Lourous's account properly and to keep him informed" and "do[] not come within the purview of the Martin Act."  *Id.*  Specifically, in sustaining the breach of fiduciary duty claim, the court reasoned the "reach of the [Martin] Act" cannot be "unlimited" and thus "[a] claim of breach of duty that involves securities but does not allege any kind of dishonesty or

deception implicates neither the plain language of the statute nor its policies." *Id.*;  *see also Hecht,* 910 N.Y.S. 2d 405, *9 (same).

The Motions to Dismiss on Martin Act preemption grounds are therefore denied.

\* \* \*

Having determined that the Martin Act and the *Wagoner* Rule do not affect the Trustee's ability to assert the Common Law Claims, this Court now turns to whether these Claims survive Rule 12(b)(6) scrutiny.  The Trustee's Common Law Claims for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting in Counts Thirteen, Sixteen, Fifteen, Seventeen, and Eighteen of the Complaint, respectively, survive Rule 12(b) scrutiny. The Trustee's claim for conversion in Count Fourteen of the Complaint, however, is dismissed with leave to amend within forty five days.

### C.    The Trustee's Claims for Breach of Fiduciary Duty and Negligence are Adequately Pled

Under New York law, "[t]he elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Rut v. Young Adult Inst., Inc.*, 901 N.Y.S.2d 715, 717 (N.Y. App. Div. 2010).  Similarly, the elements of a claim for negligence under New York law are:  "(i) a duty owed to the plaintiff by the defendants;  (ii) breach of that duty;  and (iii) injury substantially caused by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002).

The Complaint alleges that each Defendant's relationship with BLMIS was fiduciary in nature since it was "characterized by trust and reliance" as well as an "assumption of control and responsibility for the affairs of [the firm]." *TP Grp., Inc. v. Wilson,* No. 89 Civ. 2227, 1990 WL 52131, at *3 (S.D.N.Y. Apr. 17, 1990).  Peter was BLMIS's CCO, responsible for ensuring that

the IA Business had compliance procedures in place to detect any potential fraud.  Compl. ¶¶ 37-42.  Mark and Andrew were senior managers and supervisors of the firm and its Co-Directors of Trading.  Compl. ¶¶ 47-49.  Shana was BLMIS's Compliance Director, as well as compliance counsel and in-house counsel.  Compl. ¶¶ 43-46; *see also Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 168 (2d Cir. 1999) (explaining that "the attorney-client relationship entails one of the highest fiduciary duties imposed by law" and includes the duty of "operating competently").  At this stage of the proceedings, the allegations set forth in Complaint are sufficient to establish that a fiduciary relationship existed between the Defendants and BLMIS.[28]

Just as the Trustee has sufficiently alleged the existence of a fiduciary relationship between the Defendants and BLMIS, so has the Trustee plausibly alleged that the Defendants' conduct, whether intentional or negligent, constituted a breach of that relationship.  Indeed, a plausible inference can be drawn from the facts alleged that the Defendants breached their duties, expressly set forth in BLMIS compliance manuals and mandated by applicable securities laws and regulations, to properly supervise BLMIS operations.  For example, Peter is alleged to have regularly failed to perform those duties expressly delegated to him in BLMIS's internal compliance manuals including, but not limited to, "verify[ing] compliance with [BLMIS's allocation and trade aggregation] policies and procedures" and "conduct[ing] periodic reviews of allocation records in order to verify that order allocations are being made in accordance with

---

[28] The precise nature and scope of the fiduciary relationship that each individual Defendant had with BLMIS need not be ascertained at this stage.  Indeed, courts applying New York law have consistently held that such a determination is a mixed question of law and fact and cannot always be determined on a motion to dismiss.  *See Am Int'l Group, Inc. v. Greenberg*, 877 N.Y.S.2d 614 (N.Y. Sup. Ct. 2008) (denying a motion to dismiss on the grounds that "factual issues concerning the precise nature and scope of the [fiduciary] relationship . . . undoubtedly must be explored");  *see also Nisselson v. Ford Motor Credit Co.* (*In re Monahad Ford Corp. of Flushing*), 340 B.R. 1, 41 (Bankr. E.D.N.Y. 2006) (explaining that "whether fiduciary duties actually arose between the parties is a question of fact not properly addressed" at the motion to dismiss stage).

[BLMIS's] . . . procedures."    Compl. ¶ 42.    Shana similarly failed to monitor BLMIS's compliance with federal securities laws and regulations and corresponding FINRA rules and regulations, even as she assisted her father, Peter, in drafting the annual review of the IA Business compliance program.    Compl. ¶ 43, 46.    While Shana argues that her duties applied to discreet, legitimate operations of BLMIS, the Complaint provides an email in which she concedes that "the Compliance Departments' [sic] monitoring and oversight of compliance issues extends to all areas of the firm's business."    Compl. ¶ 45.    The Complaint alleges that Andrew and Mark, FINRA-registered securities principals, played roles in the IA business at various times and, upon information and belief, had "direct, investment related contacts and communications with investors in the IA business."    Compl. ¶ 49.    Peter and Andrew were licensed options principals and were correspondingly responsible for monitoring and approving the options and transactions of the firm.    Compl. ¶¶ 47–49.    Additionally, in violation of BLMIS's Anti-Money Laundering compliance program, the Defendants failed to investigate or detect suspicious transfers of BLMIS funds to MSIL, even though Mark, Andrew, and Peter were all directors of MSIL.[29]

The Second Circuit's opinion in *Gully v. National Credit Union Administration Board* illustrates how the Defendants' derelictions of their compliance and supervisory duties constitute breaches notwithstanding Madoff's confessed masterminding of the fraud.    341 F.3d 155, 159 (2d Cir. 2003).    In *Gully*, a manager of a credit union was accused of breach of fiduciary duty for failing to monitor or stop her father, the "dominant figure" at the union, from incurring personal charges on its credit card.    *Id.*    In finding that the manager "in effect, participated in h[er father's] scheme," the Second Circuit determined that her not doing anything to correct or prevent

---

[29] Bernard Madoff and Frank DiPascali, a former BLMIS employee, have pled guilty to money laundering charges arising from these transactions.

misconduct and failure to exercise reasonable diligence was "particularly egregious," given her conflict of interest and that she was the only one to police her own father. *Id.* at 165–66. The Second Circuit's reasoning in *Gully* is in line with longstanding New York precedent holding fiduciaries to a standard "stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is . . . the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 464 (1928). Fiduciary duties include discharging corporate responsibilities "in good faith and with conscientious fairness, morality and honesty in purpose" and displaying "good and prudent management of the corporation." *Alpert v. 28 Williams St. Corp.,* 63 N.Y.2d 557, 569 (1984) (internal quotations omitted).

With that in mind, the Defendants may not escape liability by pointing to Madoff's fraudulent undertakings. Put another way, Madoff's fraudulent activities do not constitute a supervening cause that severs the causal link between the Defendants' above-mentioned breaches and the foreseeable resulting harm to BLMIS. More to the point, "when the intervening, intentional act of another is itself the foreseeable harm that shapes the duty imposed, the defendant who fails to guard against such conduct will not be relieved of liability when that act occurs." *Kush v. City of Buffalo*, 59 N.Y.2d 26, 33 (1983); *see also Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 316 (1980) ("[A]n intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent."). Indeed, of all the possible parties to uncover or prevent the fraud, the Defendants were those best situated, and in fact obligated, to do so. Yet, on the basis of the facts alleged, the Defendants shirked their compliance and supervisory duties, engaged in improper personal use of BLMIS funds, and consequently impoverished BLMIS while permitting its descent towards its eventual demise. As

such, the Trustee has adequately stated claims for breach of fiduciary duty and negligence against the Defendants.

### i. Punitive Damages for Negligence and Breach of Fiduciary Duty Claims

For his negligence and breach of fiduciary duty claims, the Trustee asserts that the Defendants' "conscious, willful, wanton, and malicious conduct entitles [him], on behalf of BLMIS and its creditors, to an award of punitive damages in an amount to be determined at trial." Comp ¶¶ 187, 205. For the following reasons, the Trustee's pursuit of punitive damages against the Defendants cannot be dismissed at this early stage of the case.

Under New York law, punitive damages serve the dual purposes of punishing the offending party while deterring similar conduct by others. *See Ross v. Louise Wise Servs., Inc.*, 812 N.Y.S.2d 325, 331 (N.Y. App. Div. 2006). To be liable for punitive damages in tort causes of action, a defendant's actions must "constitute willful or wanton negligence or recklessness." *Gruber v. Craig*, 618 N.Y.S.2d 84, 85 (N.Y. App. Div. 1994) (internal quotations omitted). Acts are wanton and reckless when done in a manner "showing heedlessness and an utter disregard for the rights and safety of others." *Id.* The decision to award punitive damages "reside[s] in the sound discretion of the original trier of facts." *Louise Wise Servs., Inc.,* 812 N.Y.S.2d at 331(internal quotations omitted).

The Trustee has sufficiently alleged that the acts and omissions of the Defendants were performed under circumstances showing "heedlessness and an utter disregard" for the rights or interests of BLMIS and, ultimately, all those who foreseeably relied upon its professed integrity. As discussed extensively above, the Trustee has been unable to identify any meaningful supervision of BLMIS by the Defendants. *See, e.g.*, Compl. ¶ 47. These alleged failures to adequately fulfill their jobs were not, as Mark and Andrew contend, mere "passive shortcomings" regarding their compliance duties. Mark and Andrew Mot. at 45. Rather, the

Defendants spent every day for over twenty years in the offices of the firm where the Ponzi scheme occurred, allegedly ignoring numerous red flags and irregularities at BLMIS in order to enrich themselves and their outside business ventures at the expense of BLMIS. *See* Compl. ¶¶ 58, 62, 74, 84, 85, 94. These failures therefore may well be considered wanton and malicious conduct under the circumstances. Thus, it cannot be "conclusively determined at this stage of the litigation . . . that the wrongful conduct alleged is not sufficiently egregious to warrant the imposition of punitive damages." *D'Amour v. Ohrenstein & Brown, LLP*, No. 601418/06, 2007 WL 4126386, at *20 (N.Y. Sup. Ct. Aug. 13, 2007).

### D. The Trustee Has Adequately Pled Claims for an Accounting of Funds Allegedly Diverted from BLMIS

The Trustee has sufficiently alleged Count Eighteen of the Complaint, which states that in order "to compensate BLMIS for the amount of monies the [Defendants] diverted from BLMIS for their own benefit, it is necessary for the [Defendants] to provide an accounting of any transfer of funds, assets or property received from BLMIS." Compl. ¶ 214.

Under New York law, an accounting is a cause of action that seeks "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *Ditolla v. Doral Dental IPA of New York, LLC*, 469 F.3d 271, 275 (2d Cir. 2006) (internal quotations omitted). Its purpose is to "help sort out what assets are involved [and] enable the parties to meaningfully pursue their respective claims concerning their private or business arrangement." *Wesselmann v. Int'l. Images*, 687 N.Y.S.2d 339 (N.Y. App. Div. 1999) (finding that where the parties shared a close working relationship, an accounting is appropriate to determine what assets are involved). It is not necessary to "identify a particular asset or fund of money in the defendant's possession." *Ditolla*, 469 F.3d at 275 (internal quotations omitted). But it is necessary to establish the "existence of a confidential or fiduciary relationship and a

breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." *Palazzo* v. *Palazzo*, 503 N.Y.S.2d 381 (N.Y. App. Div. 1986); *see Akkaya v. Prime Time Transp., Inc.*, 845 N.Y.S.2d 827, 828 (N.Y. App. Div. 2007); 1 N.Y. Jur. 2d *Accounts and Accounting* § 34 (2011) (finding a fiduciary relationship between the parties and wrongdoing by the defendant to be "essential elements of an equity complaint where an accounting is demanded").

The Complaint states a claim for an accounting because it sufficiently alleges the Defendants had a fiduciary relationship with BLMIS and they breached their duties imposed by that relationship regarding the property in which the Trustee has an interest.  *See Stratton Oakmont, Inc.*, 234 B.R. at 335.  As explained above, the Complaint sufficiently alleges that the Defendants breached their fiduciary duties to BLMIS and diverted BLMIS assets for their own benefit. *See* Comp ¶¶ 28-29, 32, 37-39, 43, 45, 47-49, 51-58, 73, 94, 98, 182.  One instance where an accounting is particularly appropriate is with regard to the BLMIS funds allegedly used to pay the Defendants' personal expenses.  Comp ¶¶ 73, 84, 94, 98.  Under these circumstances, an accounting would "help sort out what assets are involved" and determine the Defendants' disposition, if any, of BLMIS property, compel them to disgorge improper gains, and obtain information in aid of recovering their withdrawals of fictitious profits.  *Wesselmann*, 687 N.Y.S.2d at 341.[30]

---

[30] The Defendants contend the Trustee should be limited solely to discovery in order to determine the amount of money at issue.  A bankruptcy trustee is permitted, however, to pursue an accounting action to determine the extent of self-dealing by a corporation's senior executives and the value of the assets of the debtor corporation.  *See In re Colonial Mortgage Bankers Corp.*, 1989 Bankr. LEXIS 2783, *18 (Bankr. D.P.R. Apr. 12, 1989) (noting that "one of the purposes of an accounting is to separate the commingled funds and assets of the defendants from the ones of the estate," the court enjoined the defendants "from transferring any personal assets until the [trustee's] accounting is performed").

**E.      The Trustee's Unjust Enrichment and Constructive Fraud Claims Are
         Adequately Pled**

Count Fifteen of the Complaint states that the Defendants benefited from the receipt of
money from BLMIS at its expense, without adequately compensating or providing value to it,
and that "[e]quity and good conscience require full restitution of the monies received by
[Defendants] from BLMIS." Compl. ¶¶ 195-96.  Count Seventeen further states that "because of
past unjust enrichment of the [Defendants], the Trustee is entitled to the imposition of a
constructive trust with respect to any transfer of funds, assets, or property from BLMIS as well
as any profits received by the [Defendants] in the past or on a going forward basis in connection
with BLMIS." Compl. ¶ 209.  Both Counts Fifteen and Seventeen of the Complaint pass muster
under Rule 12(b) because the Trustee has alleged enough facts in the Complaint to sustain his
claims for unjust enrichment and the imposition of a constructive trust against the Defendants.

New York courts have long recognized that "a court of equity in decreeing a constructive
trust is bound by no yielding formula.  The equity of the transaction must shape the measure of
relief." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378 (1919); *see
also Counihan*, 194 F.3d at 362 (same).[31]  New York courts insist upon "a showing that property
is held under circumstances that render unconscionable and inequitable the continued holding of
that property and that the remedy is essential to prevent unjust enrichment." *Counihan v.
Allstate Ins. Co.*, 194 F.3d 357, 362 (2d Cir. 1999); *see also Golden Budha Corp. v. Canadian
Land Co. of Am., N.V.,* 931 F.2d 196, 202 (2d Cir. 1991).  An unjust enrichment claim brought

---

[31] In determining whether to impose a constructive trust under New York law, courts consider four factors:  (1) a
confidential or fiduciary relationship;  (2) a promise, express or implied;  (3) a transfer made in reliance on that
promise;  and (4) unjust enrichment. *Sharp v. Kosmalski*, 351 N.E. 2d 721, 723(1976).  However, "these factors are
merely useful guides and are not talismanic." *Coco v. Coco*, 485 N.Y.S.2d 286 (N.Y. App. Div. 1984) (internal
quotations omitted); *see also In re Koreag*, 961 F.2d at 352 ("Although these factors provide important guideposts,
the constructive trust doctrine is equitable in nature and not to be rigidly limited.") (internal quotations omitted);
*Palazzo*, 503 N.Y.S.2d at 383–84 ("[T]he power of equity to employ a constructive trust to reach a just result is not
strictly limited by the conditions set forth in *Sharp v. Kosmalski*.").

under New York law must be predicated on factual allegations that the defendant was enriched at the plaintiff's expense, and that "it is against equity and good conscience to permit [the defendant] to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y. 3d 173, 182 (2011). To prove such a claim, it is necessary to show that "one party has received money or a benefit at the expense of another." *See Amusement Indus., Inc. v. Stern*, No. 07-11586, 2010 WL 445906, at *21 (S.D.N.Y. Mar. 1, 2010) (internal citations omitted). The transaction must be "unjust." *McGrath v. Hilding*, 41 N.Y.2d 625, 627 (1977). But, "whether there is unjust enrichment may not be determined from a limited inquiry confined to an isolated transaction. It must be a realistic determination based on a broad view of the human setting involved." *Id.*

Here, the Defendants allegedly misappropriated BLMIS's funds for improper personal uses such as funding personal business ventures and homes. Compl. ¶¶ 66-99. The Defendants also allegedly failed to perform legal compliance and supervisory responsibilities they were legally obligated to perform at BLMIS, but nevertheless received astronomical compensation from the same. Compl. ¶¶ 28, 37, 43, 57, 58, 64. These and other similar facts alleged in the Complaint, when viewed in conjunction with the relevant precedent, sufficiently establish that the Defendants ended up with BLMIS's funds that they should not possess, and more to point, in possessing them, the Defendants unjustly enriched themselves at the expense of BLMIS.

As the Trustee has sufficiently alleged that the Defendants are unjustly enriched by property rightfully belonging to BLMIS, the Trustee has adequately pled the requisite equitable basis for the imposition of a constructive trust. *Simonds v. Simonds*, 45 N.Y. 2d 233, 242 (1978) ("[T]he purpose of a constructive trust is the prevention of unjust enrichment."). Contrary to the Defendants' arguments that a constructive trust can "wreak havoc" with the Code, *see* Mark and

Andrew Mot. p. 21 n.10, this Court's conclusion squares with Second Circuit precedent that counsels against freely imposing constructive trusts in bankruptcy proceedings. *See In re Flanagan,* 503 F.3d 171, 182 (2d. Cir. 2007); *Superintendent of Ins. v. Ochs (In re First Central Fin. Corp.),* 377 F.3d 209, 217 (2d Cir. 2004). As the Second Circuit recently explained,

> The effect of a constructive trust in bankruptcy is profound. While the bankrupt estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to include all legal and equitable interests of the debtor, any property that the debtor holds in constructive trust for another is excluded from the estate pursuant to § 541(d) . . . A constructive trust thus places its beneficiary ahead of other creditors with respect to the trust *res.*

*In re Flanagan*, 503 F.3d at 182. Simply put, "the effect of constructive trust in bankruptcy is to take property out of the debtor's estate. . . . This type of privileging of one unsecured claim over another clearly thwarts the principle of ratable distribution underlying the Bankruptcy Code." *Id.*; *see also In re First Central*, 377 F.3d at 217 ("By creating a separate allocation mechanism outside the scope of the bankruptcy system . . . the constructive trust doctrine can wreak . . . havoc with the priority system ordained by the Bankruptcy Code."). It follows, therefore, that these concerns only apply in cases where the property in question is held by the estate, and is set to be equitably distributed among general unsecured creditors, which is patently not the case here. *In re Flanagan*, 503 F.3d at 182 ("It is . . . not the debtor who generally bears the burden of a constructive trust in bankruptcy, but the debtor's general creditors."). In the pending matter, where the property in question is not possessed by the Trustee but rather by the Defendants, the same threat does not exist, and thus imposing the constructive trust to prevent each Defendant's unjust enrichment at the expense of BLMIS does not clash with the underlying property principles of equitable distribution under the Code or under SIPA.

Thus, for the aforementioned reasons, the Motions to Dismiss Counts Fifteen and Seventeen of the Complaint are denied.

**F.      The Trustee's Claim for Conversion is Dismissed**

Under New York law, "[c]onversion is an unauthorized assumption and exercise of the right of ownership over [property] belonging to another to the exclusion of the owner's rights." *Traffix v. Herold*, 262 F. Supp. 2d 223, 228 (S.D.N.Y. 2003).  Specifically, a conversion action requires that the plaintiff has legal ownership or an immediate superior right of possession to the property he seeks to recover and that the defendant exercised an unauthorized dominion over that property "to the alteration of its condition or to the exclusion of the plaintiff's rights."  *Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*, No. 08-CV-9492, 2011 WL 813724, at *14 (S.D.N.Y. Mar. 8, 2011);  *Mia Shoes, Inc. v. Republic Factors Corp.*, No 96-CIV-7974, 1997 WL 525401, at *3 (Bankr. S.D.N.Y. Aug. 21, 1997) (same).  When money, rather than a chattel, is the property at issue, it "must be specifically identifiable."  *Interior by Mussa, Ltd. v. Town of Huntington*, 664 N.Y.S.2d 970, 972 (N.Y. App. Div. 1997).  In fact, "if the allegedly converted money is incapable of being described or identified in the same manner as a specific chattel . . . it is not the proper subject of a conversion." *Id.*

Because the Complaint does not seek a specific amount of money converted from a particular account, but rather "an award of compensatory damages in an amount to be determined at trial" it fails to state a claim for conversion under New York law.  Compl. ¶ 192. The Complaint asserts vague, unsubstantiated allegations that "BLMIS had a possessory right and interest to its assets, including its customers' investment funds,"  Compl. ¶ 189, and "[t]he Family Defendants converted the investment funds of BLMIS customers when they received money originating from other BLMIS customer accounts in the form of loans, payments, and other transfers.  These actions deprived BLMIS and its creditors of the use of this money," Compl. ¶ 190.  Such allegations "merely refer[] to unspecified monies and assets" and give "no

indication of an identifiable fund or otherwise segregated amount, nor. . . any description of the alleged transfer or transfers from which the Court could infer a specifically identified fund of money." *Global View Ltd. Venture Capital v. Great Central Basin Exploration*, *L.L.C.*, 288 F. Supp. 2d 473, 480 (S.D.N.Y. 2003);  *see also Cal Distrib. Inc. v. Cadbury Schweppes Americas Beverages, Inc.*, No. 06 Civ. 0496, 2007 WL 54534 (S.D.N.Y. Jan. 5, 2007).  These allegations are inadequate to sustain the Trustee's conversion claim against the Defendants.  Thus, Count Fourteen of the Complaint is dismissed with leave to amend within forty five days.

## <u>CONCLUSION</u>

For the aforementioned reasons, the Motions to Dismiss are denied except with regard to the Trustee's:  (1) Preference claims in Count Two, (2) Actual and Constructive Fraudulent Transfer claims in Count Three through Nine to the extent stated herein, (3) Subsequent Transfer claims in Count Ten, and (4) his conversion claim in Count Fourteen, with leave to amend the Complaint within forty five days consistent with the foregoing determinations.

Thus, to the extent described above, the Motions to Dismiss the Complaint are DENIED in part and GRANTED in part.

**IT IS SO ORDERED**.

Dated: New York, New York
         September 22, 2011

                                        /s/ Burton R. Lifland_____
                                        UNITED STATES BANKRUPTCY JUDGE